# WHEELING.

## STATE OF WEST VIRGINIA *v.* CARTRIGHT.

Submitted June 23, 1882—Decided July 1, 1882.

1. Challenge to the array of the jury must be based on some irregularity affecting the whole panel, such as a failure to select or summon them as required by the statute, or where there is partiality, relationship or default in the officer, who made the return, &c.   (p. 36.)

2. A motion to quash an indictment for defects on its face, where the motion is general, will be overruled, if the indictment contains one good count. (p. 39.)

3. Generally the mere separation of the jury, after they have been empanelled, without the attendance of the officer or misconduct of the jury in the presence of the officer, though improper and irregular, is not a sufficient cause for setting aside the verdict, especially in cases not capital, if the court is satisfied, that the prisoner has sustained no injury from such separation or misconduct. (p. 41.)

4. But where there has been an improper separation or misbehavior of the jury during the trial, if the verdict is against the prisoner, he is entitled to the benefit of the presumption, that the irregularity has been prejudicial to him; and the burden of proof is upon the prosecution to show beyond a reasonable doubt, that the prisoner has suffered no injury by reason of the separation or misbehavior. If the prosecution fails to do this, the verdict should be set aside. (p. 41.)

5. Except in very special cases the testimony of jurors ought to be admitted, generally, only in support of their verdict in cases, where facts come to the attention of the court regarding the conduct of the jury, or of one or more of its members, which *prima facie* vitiate the verdict. In such case any juror or all the members of the jury severally may state any facts or circumstances within his own knowledge tending to explain such conduct, or which may tend to remove the presumption of the invalidity of the verdict; but his testimony should not be received to show, by what motives he was actuated, or that any admitted fact, misconduct or irregularity had no influence or effect in producing the verdict. He should be admitted only to disprove or explain such fact, misconduct or irregularity; and if such fact, misconduct or irregularity be not disproved or explained, so that the court is satisfied beyond a reasonable doubt, that no injury was caused thereby to the accused, the verdict should be set aside. (p. 43.)

6. Even in such cases the testimony of jurors should be received with great caution. (p. 43.)

7. On the trial of an indictment for a felony, after all the evidence has been heard by the jury, and they have been put in charge of the officer for the night, the said officer at the instance of some of the jury brings to the jury-room one of the principal witnesses for the prosecution, who was an active participant in the fight, which caused the indictment, to play the fiddle for the jury. Said witness came into said room and remained there with the jury and the officer for half an hour fiddling for the jury; and in response to an enquiry from a brother of said witness, who came to the jury-room, while said witness was in the

room with the jury, said officer stated, that said witness was not in the room. Afterwards the jury heard the argument of counsel and returned a verdict of guilty. On a motion to set aside the verdict the jury and the officer file affidavits, that no conversation or communication was had between the jury and said witness touching the trial or in any manner whatever, and that the presence or conduct of said witness had no influence on their verdict; but the affidavit of said witness was not taken, nor was any excuse offered for not taking it. This was ground for setting aside the verdict. (p. 44.)

Writ of error and *supersedeas* to a judgment of the circuit court of the county of Marion, rendered on the 23d day of December, 1881, in an action in said court then pending by the State of West Virginia against Thomas Cartright upon an indictment for felony, allowed upon the petition of said Cartright.

Hon. A. B. Fleming, judge of the second judicial circuit, rendered the judgment complained of.

The facts of the case fully appear in the opinion of the Court.

*James Morrow, Jr.*, for the plaintiff in error, cited the following authorities: Code ch. 144 § 9; 24 Gratt. 644; 23 Gratt. 27; 22 Gratt. 907; 13 W. Va. 859; 2 Tuck. Com. 303; Whart. Cr. Pl. & Pr. § 607; 18 Gratt. 983.

*Attorney General Watts* for the State cited the following authorities: Archb. 6, Cr. Pl. & Ev. (10th London ed.) 449; 1 Moody 318; 2 Bish. Cr. Pro. § 654; 5 W. Va. 511; 4 Blackst. Com. 352; 3 Blackst. Com. 359; Id. 354; Min. Cr. Pr. 249; Whart. Cr. Pl. & Pr. (8th ed.) § § 848, 849; 1 Bish. Cr. Pr. § 999 and n. 4; 19 Gratt. 540; 107 Mass. 453; 57 Mo. 40; 28 Ark. 155; 7 W. & S. 421; Whart. Cr. Pl. & Pr. § 843, n. 1.

SNYDER, JUDGE, announced the opinion of the Court:

On the 22d day of November, 1881, Thomas Cartright was indicted in the circuit court of Marion county under the provisions of section 9 chapter 144 of the code of this State. The indictment contains two counts. The first charges, that

said Cartright, on the 29th day of October, 1881, in said county, in and upon one John Cunningham, did make an assault and him, the said John Cunningham, "feloniously and maliciously did stab, cut and wound with intent him, the said John Cunningham, then and there to maim, disfigure, disable and kill," &c. The second count is the same as the first except for the words above quoted, it uses the words, " unlawfully but not maliciously did stab, cut and wound with intent him, the said John Cunningham, then and there to maim, disfigure, disable and kill," &c.

The defendant moved said court, on the 26th day of November, 1881, " to quash said indictment," and pleaded not guilty. On December 15th the court overruled said motion, and thereupon the defendant challenged the array of jurors summoned for that term and then in attendance for the trial of the defendant, and moved the court to set aside the panel and award a *venire de novo*, upon the ground that one of said panel, who was a brother of the prosecuting witness, had been active in assisting to obtain witnesses for the State and pressing the trial of defendant, and had been industriously seeking to poison and influence the minds of said panel against the defendant, and that two of said panel had been summoned as witnesses in the case for the State, which motion, upon demurrer by the State, the court overruled and refused to set aside the panel. "And the court then proceeded to draw and empanel a jury of twenty men free from exception in the manner prescribed by law, and having exhausted the panel of regular jurors in attendance and only having obtained seventeen free from exception, the court directed the sheriff of the county to summon additional jurors; and three additional jurors having been so obtained, making a full special panel of twenty jurors free from exception, thereupon the prisoner assisted by his attorneys struck off eight and the twelve not stricken off" composed the jury, which tried the defendant. The jury were sworn and the trial commenced on the 15th of December, 1881; and on the 20th of December the following verdict was returned: "We, the jury, find the defendant, Thomas Cartright, not guilty of maliciously cutting, stabbing and wounding John Cunningham, with intent to maim, disable, disfigure and kill, as

charged in the within indictment, but we find said Thomas Cartright guilty of unlawfully and feloniously cutting him, the said John Cunningham, with intent him, the said John Cunningham, to disfigure, disable and kill, and we fix and ascertain his term of imprisonment in the penitentiary of this State at fifteen months."

The defendant moved the court to set aside the verdict and grant him a new trial and also moved for an arrest of judgment, which motions the court severally overruled and pronounced judgment against the defendant on said verdict; and the defendant on petition to this Court obtained a writ of error.

Neither the facts proved nor the evidence heard on the trial nor any part of either appear in the record. After the verdict was rendered, and while the motion to set aside the verdict was pending, certain affidavits in support of and against said motion relating to the conduct of the jury were read and made part of the record by bill of exceptions. The facts contained in said affidavits will be hereafter stated.

The plaintiff in error assigned four grounds of error for which he insists this Court should reverse said judgment.

*First*—He contends, that his challenge to the array of the jury should have been sustained, and the panel set aside. A reference to the facts upon which this challenge was founded, will show that they consist entirely of objections to three members of the panel. These grounds were no doubt good against these particular jurors, of which the defendant evidently availed himself in the selection of the panel of twenty free from exception, but they do not constitute a basis for a challenge to the array. Challenge to the array must be based upon some irregularity affecting the whole panel, such as a failure to select or summon as required by the statute, or on account of the partiality, relationship, or default of the officer who made the return, or any other ground, which would tend to show, that the panel was not fairly and legally constituted— Whart. Cr. Pl. & Pr. § 607; 3 Bla. Com. 359.

We are, therefore, of opinion that the court did not err in disregarding said challenge.

*Second*—It is claimed, that the defendant's motion to quash the indictment should have been sustained, because the

second count was fatally defective. The motion to quash was general as to the whole indictment, and such motion can have no greater effect in this case than a general demurrer. It is a well settled principle of law, that a general demurrer is bad, if the indictment contains one good count. Whart. Cr. Pl. & Pr., § 401; *Ingram* v. *State*, 39 Ala. 247; *Rand's case*, 9 Gratt. 738. The first count in this indictment is confessedly good; consequently, the motion to quash was properly overruled, even if the second count is defective. It is insisted that the second count is bad, because it does not contain the word "felonious," and in support of this position is cited, *Randall's case*, 24 Gratt. 644.

The statute (Code chapter 144, sec 9,) under which this indictment was found, provides for the punishment of two grades of crimes. Those of the first class, where the act is done maliciously, are felonies in all instances; while those of the second class, where the act is done unlawfully but not maliciously, are at the discretion of the jury either felonies or misdemeanors. The case of Randall aforesaid is of the first class and was necessarily a felony; the second count in the case at bar is of the second class and may or may not be a felony. This count uses the precise language of the statute; and while it would seem to be clearly sufficient to support a verdict for a misdemeanor, it is unnecessary for us in this case to decide, whether or not it would support a verdict for a felony. This question is therefore not passed upon.

*Third*—It is claimed, that the defendant's motion in arrest of judgment was improperly denied. The defendant contends, that the verdict of the jury acquits him of the offence charged in the first count of the indictment, and as the second count is bad, no judgment could or ought to have been rendered on said verdict. The verdict finds the defendant "not guilty of maliciously cutting, stabbing," &c., but "guilty of unlawfully and feloniously cutting, stabbing," &c., and fixes his term in the penitentiary at fifteen months. It makes no reference to the different counts of the indictment, but finds the defendant guilty generally. It has as much application to the first count as it has to the second; and if the verdict is of such a character, that it could have been found under the first count, the judgment was proper without regard to the

sufficiency of the second count to sustain the verdict. Was the verdict such as the jury were authorized to find under the first count?

Our Code, chapter 159 section 20, provides: "And on any indictment for maliciously shooting, stabbing, cutting, or wounding a person, or by any means causing him bodily injury, with intent to kill him, the jury may find the accused not guilty of the offence charged, but guilty of maliciously doing such act with intent to maim, disfigure or disable, or of *unlawfully* doing it, with intent to maim, disfigure, disable or kill such person." Under this statute the accused may by its express terms be found not guilty of "maliciously" doing the act charged in the first count of this indictment, but guilty of doing it "unlawfully" as the jury did in this case—*Canada's case*, 22 Gratt. 899. The court therefore properly denied the motion in arrest of judgment and for a new trial.

*Fourth*—It is lastly contended, that the verdict of the jury ought to be set aside for the causes assigned in the affidavits of T. F. Cartwright and E. C. Snodgrass filed on behalf of the defendant. These affidavits state, substantially, that the affiant T. F. Cartwright is the father of the defendant; that after all the evidence had been heard on Saturday evening, the 17th December, 1881, while the jury were in a room at the hotel in charge of the deputy sheriff, C. E. Manley, to be kept apart and brought into court on Monday morning to hear the argument of counsel, Ward Watson, who was one of the principal witnesses for the prosecution, and whose evidence given on the trial showed, that he had been actively participating in the encounter and fight, in which the offence in the indictment is shown to have been committed, was admitted into said room, in which said jury then was, and remained there from half an hour to an hour entertaining said jurors by playing on a fiddle and in other ways unknown to affiant; that John Cunningham was also admitted into said jury-room, where said jury were, he being the person, on whom the felony charged in the indictment is alleged to have been committed, and the principal witness against defendant; and that he remained in the room with the jury sometime, but how long is to affiant unknown; that while said Watson was in said jury-room, Fleming Watson, a brother

of said Ward Watson, in company with affiant, T. F. Cartright, approached the door of said room and the deputy sheriff repeated three times that said Ward was not in the room with the jury; and that said affiant, T. F. Cartwright, says, that said Ward Watson was admitted into said jury-room clandestinely, as he believes, and also that said Cunningham was there clandestinely and improperly.

In opposition to said motion the prosecuting attorney filed the joint affidavit of all the members of the jury and the affidavit of the deputy sheriff, C. E. Manley. The said affidavits of the jury and said Manley do not deny the facts stated in the said affidavits filed on behalf of the defendant except in the following matters: they say, that said Ward Watson was not clandestinely admitted into said room, nor was he there secretly and improperly, but came in openly and publicly at the request of some of the jury for the purpose of playing on said fiddle and for that purpose only; that before said Watson came into the room the said deputy sheriff warned and admonished said jury and each member thereof not to have any conversation or communication with him, which said warning and admonition was strictly and carefully observed by the jury and by each member thereof; that said Watson did not remain in said room with the jury exceeding one-half hour, during the whole of which time he was playing said fiddle; that said John Cunningham was in the room with the jury not over from three to five minutes; that he came with said Watson uninvited and was almost immediately requested to go out by the said Manley, deputy sheriff, and he immediately went out of the room; that said Manley, deputy sheriff as aforesaid, was present with said jury during all the time the said Watson and Cunningham were in said room with the jury, and that neither said Watson nor said Cunningham had any conversation or communication whatever with the said jury or with any member thereof, or with the said deputy sheriff or any other person of and concerning said trial, nor was there any communication whatever had between said Watson or Cunningham and the said jury or any member thereof, or with any one in the presence or hearing of said jury, by writing, sign or token or in any other manner or by any means whatever. And the said

jury state, that the presence of said Watson and Cunningham and the music of said violin, played as aforesaid by said Watson, nor either of them, had any influence or effect on them or any member thereof, in making up their verdict in said case.

The said C. E. Manley states, that he was the deputy sheriff, who had charge of said jury; that there was a dance at the hotel, at which the jury were kept; that the jury heard the music at said dance and being informed by affiant, that Ward Watson was playing the fiddle, some of the jury requested him to get said Watson to play some for the jury, and on Saturday the 17th of December, 1881, he asked said Watson to come to said hotel and play some for said jury, and the said Watson came, as hereinbefore stated; that while he was in the jury room as aforesaid, his brother, Fleming Watson, came to the door and inquired of affiant, if Ward Watson was in said room, to which enquiry affiant responded, "He is not here," or words to that effect, which response was given to the said Fleming Watson by affiant for no improper purpose; but it is not true that affiant repeated it as much as two or three times, or in fact at all.

These facts and circumstances present the serious enquiry: What are the legal consequences of the misbehavior of the jury, while in charge of the officer during the recess or adjournment of the court?

In *Philip's case,* the court after referring to the unsettled condition of the decisions in Virginia lays down the rule in cases of separation of the jury, "that separation out of the custody and control of the officer is *prima facie* sufficient to vitiate the verdict; and that it is incumbent on the commonwealth to refute that *presumption* by disproving all probabilities or suspicions of tampering"—19 Gratt. 540.

In, 1 Bishop on Crim. Pro. § 999, the law is stated thus: "It does not follow from the mere fact of misbehavior of one or more of the jurors, whether with or without the consent of the officer in charge, that their verdict will be therefore set aside on the application of the prisoner. There is no general rule which can be given on this subject other than, that if the misbehavior is of such a nature as may have been in its effect prejudicial to the prisoner, the verdict will be set

aside; if otherwise it will not be. And upon this matter the practice of the courts is varying and somewhat conflicting." See, also, Wharton's Crim. Plead. and Prac. § 823 and a number of cases there cited.

From the position generally taken by the American courts and the policy of the law, so far as it can be safely stated in general terms, the proper rule seems to be, that the mere separation of the jury or some of its members, after they have been empaneled, without the attendance of an officer, or misconduct of the jury in the presence of the officer, though improper and irregular, is not a sufficient cause for setting aside the verdict of the jury, especially in cases not capital, if the court is satisfied, that the prisoner has sustained no injury from such separation or misconduct. But where there has been an improper separation or misbehavior of the jury during the trial, if the verdict is against the prisoner, he is entitled to the benefit of the presumption, that the irregularity has been prejudicial to him, and the burden of proof is upon the prosecution to show beyond a reasonable doubt, that the prisoner has suffered no injury by reason of the separation or misconduct. If the prosecution fails to do this the verdict should be set aside. *State* v. *Prescott*, 7 N. H. 287; *McCaul's Case*, 1 Va. Cas. 271.

The difficulty in the application of this rule is more serious than the deduction of the rule itself. How is the prosecution to show, that the irregularity or misconduct of the jury has caused no detriment to the accused? Can the person suspected of tampering with the jury be allowed to offer himself as a witness to show the character of his conduct? In *McCaul's Case*, Judge Nelson, in delivering the opinion of the court, says: "From the mode, in which collusion and tampering is generally carried on, the circumstances are generally known to no person except the one tampering and the one tampered with or the persons, between whom a conversation may be held, which might influence the verdict. If you question either of these persons on the subject, he must criminate or declare himself innocent, and you lay before him an inducement not to give correct testimony"—1 Va. Cas. 305. The officer and the jurors have the same temptation not to give unbiased testimony, if called on to relieve

themselves from suspicion or misconduct. In *Bull's case*,
14 Gratt. 613, most of the authorities, English and Ameri-
can, including the Virginia cases, on the subject were re-
ferred to, and the court concluded, that, "In view of all the
authorities and of the reason, on which they are founded, we
think as a general rule the testimony of jurors ought not to
be received to *impeach* their verdict especially on the ground
of their own misconduct."

It would seem, that the same decisive reasons, which would
exclude the testimony of jurors to impeach their verdict,
would be equally strong, when their evidence is offered to
sustain their verdict. In criminal cases particularly the
temptation offered to jurors to explain or excuse irregulari-
ties in their conduct is very great. If they admit miscon-
duct they are liable to censure and perhaps to be fined; con-
sequently, they are more likely to deny than to admit, that
their verdict was influenced by any misconduct or impro-
priety. If they are men of integrity and character, their
conduct will be such as not to require any exculpation; and
if they are not such, the prisoner has but little protection in
relying upon their consciences to accuse themselves. Thus
the rule, which denies the admissability of the evidence of
jurors to impeach their verdict and allows such evidence to
support it necessarily operates to the prejudice of the accused
and tends to violate the most sacred obligation of the State,
to see, that the lives and liberty of her citizens are secured,
and that every reasonable presumption shall be in favor of
the innocence of the accused. Both reason and the theory
of criminal proceedings in this country would seem to re-
quire, that the testimony of jurors should not be admitted
either to impeach or to support their verdict.

But it must be conceded, that the authorities in Virginia
have not carried the doctrine of exclusion to this extent; and
while we feel bound by the decisions of that State, as they
were, when this State was formed, we are not willing to ex-
tend, what we do not regard as an entirely satisfactory doc-
trine. There does not seem to be any established rule in
Virginia; but the practice has been to allow the jurors to
testify against charges or suspicions of irregularity and mis-
behavior preferred against them by third persons or outside

parties, tending to show the invalidity of their verdict. But exactly what weight should be given to their testimony, and under what circumstances it is admissible, is not defined, as each case seems to have been governed by the special facts, upon which it was decided. It is, however, admitted in all the cases, in which the testimony of jurors is received, that it ought to be heard with very great caution, because "a juror, who comes forward to impeach his verdict on the ground of his own misconduct, has little or no claim to our credit; and the safest general rule," says Moncure J., "is to shut the door against him. A person convicted of perjury is an incompetent witness. Why not a juror, who denies the truth of his verdict, and, if his denial be true, thereby convicts himself of the highest moral, if not legal, perjury"—14 Gratt. 632.

In *Cochran* v. *Street*, 1 Wash. 79 and *Moffet* v. *Bowman*, 6 Gratt. 219, the verdict was set aside on the affidavits of jurors. And in *Price* v. *Warren*, 1 H. & M. 385; *Shobe* v. *Bell*, 1 Rand. 39; *Hansbarger* v. *Kinney*, 6 Gratt. 287; and *Carr* v. *Magruder*, 2 Pat. & H. 107, the court refused to set aside the verdict on such affidavits. In *McCaul's case* 1 Va. Cas. 271; *Kennedy's case* 2 Va. Cas. 510; *Overbee's case* 1 Rob. 756; *McCarter's case* 11 Leigh. 633; *Thompson's case* 8 Gratt. 637; and *Read's case* 22 Gratt. 924, the affidavits of jurors were read in support of their verdicts; but no rule is attempted to be laid down or any principle announced as to the character of the case or the state of facts, in which it is proper to admit such affidavits. Nor does it clearly appear, what weight, if any, was given to the affidavits of the jurors in these cases.

In this unsatisfactory and undefined condition of the law and without intending to decide, that there are no exceptions, we think, as a general rule, where the evidence of jurors is admissible, it ought to be received with very great caution, and except in very special cases it ought to be admitted generally only in support of their verdict in cases where facts are brought to the attention of the court regarding the conduct of the jury or one or more of its members, which *prima facie* vitiates their verdict. In such case any juror, or all the members of the jury *severally*, may state any facts or circumstances within his own knowledge tending to explain such conduct, or which may tend to remove the presumption of

the invalidity of the verdict; but his evidence should not be received to show, by what motives he was actuated, or that any admitted fact, misconduct or irregularity had no influence or effect in producing the verdict. He should be admitted only to disprove or explain such fact, misconduct or irregularity, and if not disproved or explained, so that the court is satisfied beyond a reasonable doubt that no injury was done thereby to the accused, the verdict should be set aside.

Applying these conclusions of law to the facts in this case, should the verdict of the jury be set aside? Under the rule thus announced we must exclude altogether from our consideration those statements of the jurors, which attempt to show, that they were not influenced by the presence and acts of Ward Watson, while in the jury-room, or the motives, which influenced them to invite said Ward to said room to play the fiddle. Excluding these statements we have the admitted facts, that Ward Watson, one of the principal witnesses for the prosecution, whose evidence showed on the trial, that he had actively participated in the fight, which was the cause of the indictment in this case, at the request of the jury and by the invitation of the sheriff was admitted into the jury-room and remained there fiddling for half an hour; that he came to said room in company with Cunningham, the prosecuting witness, on whom the assault was made; and that while in there upon enquiry being made by his brother for said Watson, the officer in charge of the jury denied, that said Watson was in the room.

The circumstances, under which Cunningham entered the jury-room show, that neither the jury nor the officer were to blame. He came there without the consent or permission of either and was immediately requested to go out, which he did. Therefore we do not think his intrusion ground enough for setting aside the verdict. But the facts in relation to Ward Watson are very different. He not only came into the room by permission but upon the request of the jury and the officer, and by their consent remained there for half an hour. And the fact, that the officer denied, that he was in the room, when he was in fact there, excites a strong suspicion, that the officer at least knew that he was improperly there, and showed a consciousness of misconduct and a disregard

of his sworn duty. It is true, the jury jointly swear, that there was no conversation or communication had between him and any member of the jury touching the matter of the trial, and the officer swears the same; but it is improbable, that all the members of the jury and the officer had their attention on Watson the whole time he was in the room, or that each of them could know personally, that no communication took place between him and any other member of the jury. The only person who could have testified with certainty to this fact was Watson himself, and his affidavit is not taken: The absence of the testimony of Watson and of any excuse therefor is a very suspicious circumstance.

Without commenting further upon the facts it is sufficient to say, that the conduct of both the jury and the officer in this matter was a gross violation of their duty, for which they merited severe reprehension and censure, and perhaps should have been heavily fined. The State had charge of the prisoner, and it was her duty under the law to see, that he had a fair and impartial trial, and, so far as practicable by the most guarded caution, to allow no suspicion of unfairness. Although there might be and perhaps was no tampering with the jury in this case, yet in a free country it is better, that the inconvenience of a new trial should be incurred, than that just principles should be disregarded, and a suspicion remain, that a citizen has been convicted without a fair and impartial trial. The law, as we have heretofore declared, casts the burden of removing all suspicion of unfairness upon the State, and we are unable to say in this case, that that suspicion has been removed to our entire satisfaction or beyond a reasonable doubt; we are therefore of opinion, that the circuit court of Marion county erred in overruling the motion of the defendant to set aside the verdict of the jury and grant him a new trial.

It is therefore considered, that the aforesaid judgment be reversed and annulled, the verdict set aside and a new trial awarded. And this cause is remanded to the circuit court of Marion county for further proceedings to be there had according to the principles announced in this opinion and further according to law.

THE OTHER JUDGES CONCURRED.

JUDGMENT REVERSED.     CAUSE REMANDED.