# CHARLES TOWN.

STATE v. COTTS.

49 615
51 472
52 368

Decided September 7, 1901.

1. VENIRE—*Its Conduct—Sheriff—Jurors.*

   A mere business or other conversation by a juror' with another person, entirely foreign to the case on trial, in the presence and hearing of the sheriff and other jurors, although reprehensible because it shows a lack of respect for the law on the part of both officer and juror participating in it and is unseeming and reproachful in the administration of justice, will not render a verdict void. (p. 617).

2. SEPARATION OF JURY—*Verdict—Felony Trial.*

   Points 3, 4, 5 and 6 of the syllabus in the case of the *State* v. *Cartright*, 20 W. Va. 32, points 15, 16 and 17 of the syllabus in the case of *State* v. *Robinson*, 20 W. Va. 713, points 1, 2, 3 and 4 of the syllabus in *State* v. *Harrison*, 36 W. Va. 729, and point 5 of the syllabus in *State* v. *Belknap*, 39 W. Va. 427, examined and approved, as correctly stating the law relating to the effect of the improper separation or misconduct of jurors upon their verdict. (p. 623).

3. JURY IN FELONY CASES—*Actions Prejudice Prisoner.*

   While all the jurors in a felony case are attended by proper officers, there can be no such separation as will raise a presumption of impurity in their verdict and throw upon the State the burden of showing, beyond a reasonable doubt, that the prisoner has suffered no injury by reason thereof, the verdict being against him; but, under such circumstances, there may be such misbehavior on the part of the jurors as will raise such presumption. (p. 628).

Error to Circuit Court, Marshall County.

W. J. Cotts was convicted of forgery, and brings error.

*Affirmed.*

W. W. ARNETT and J. HOWARD HOLT, for plaintiff in error.

R. H. FREER, ATTY. GEN., ALEX. DULIN, W. C. MEYERS and S. O. BOYCE, for the State.

POFFENBARGER, JUDGE:

In the circuit court of Marshall County, on the 4th day of

August, 1900, the defendant herein, W. J. Cotts, was sentenced
to three years' imprisonment in the penitentiary of this State,
upon a verdict of guilty, found by a jury on the 5th day of July,
1900, upon an indictment, charging him, in the first count there-
of, with having unlawfully and feloniously forged the endorse-
ment of J. G. Haberfield on the back of a promissory note for
two hundred dollars, signed by said defendant, dated Wheeling,
West Virginia, July 27, 1899, and payable four months after
date to the order of said Haberfield at the Bank of Wheeling,
and, in the second count, with having unlawfully and feloniously
uttered and attempted to employ as true said forged endorse-
ment, with intent to defraud, he knowing the endorsement to be
forged.

Before judgment was entered on the verdict, the defendant
moved to arrest the judgment and to set aside the verdict and
grant him a new trial, and, in support of the motion, filed a
number of affidavits to show that there had been such miscon-
duct on the part of some of the jurors as to vitiate the verdict.
Counter affidavits of jurors, officers, and others were filed on be-
half of the State. The memorandum at the foot of the order
recites that the defendant took twelve bills of exceptions, but,
as only bill of exception No. 1, containing the affidavits, is found
in the record, no notice can be taken of the others. The court
overruled the motion and the defendant excepted..

The defendant assigns as grounds of error, first, the over-
ruling of the demurrer to the indictment, second, the overruling
of the motion to set aside the verdict, and, third, the overruling
of the motion to set aside the verdict on the ground of the sepa-
ration or misconduct of the jury. As the evidence does not
appear, the second assignment cannot be considered, and as to
the first, nothing is presented in the brief of the plaintiff in
error, the argument of his counsel being confined solely to the
question of misconduct on the part of the jury. In substance
and all material respects, the indictment follows the form found
in Mayo's Guide, which has for many years been used both in
this State and Virginia, and was approved by this Court in
*State* v. *Tingler,* 32 W. Va. 546.

It is based upon section 5 of chapter 146 of the Code, which
reads as follows: "If a person forge any writing, other than
such as is mentioned in the first and third sections of this chap-

ter, to the prejudice of another's right, or utter or attempt to employ as true, such forged writing, knowing it to be forged, he shall be confined in the penitentiary not less than two nor more than ten years."

As this statute makes it an offense to forge any writing to the prejudice of another's right, or, knowing the writing to be forged, utter or attempt to employ it as true, it seems to be clear that such writing may be an endorsement in blank on the back of a promissory note as well as any other, although the name thus forged, without the writing on the face of the note, could not prejudice any one. But the indictment fully describes the instrument upon which the defendant is alleged to have feloniously written the name of Haberfield, and thus the allegations of the indictment clearly and fully set forth an offense under this statute. All of the note, except that, might lawfully, and without any criminal intent, have been written by the defendant, for it purports to be the note of Cotts himself payable to Haberfield. His writing Haberfield's name on the back of it gave it the false and fraudulent appearance of having been negotiated by Haberfield.

It is not necessary to set out in what particular acts the forgery consisted, but all the ingredients of the offense must be set out with certainty and precision; and, at common law, the elements of it are writing, an evil intent, and a false making of such writing. 8 Am. & Eng. Ency. Law 500, 501. To this the statute adds uttering, or attempting to employ as true a forged writing, knowing it to be forged. All these requirements are met by the indictment, and the demurrer was properly overruled.

The alleged misconduct of the jury consists of a number of incidents or transactions, the most of which occurred on the 4th day of July, 1900, after the completion of the argument and retirement of the jury. Prior to that time, there were some acts on the part of the jurors about which complaint is made. W. O. Ewing says that on or about June 30th, he saw two or three of the jurors leave the others and pass into a cigar store or confectionary, owned by S. P. Hubbs, where they remained for a short time out of the custody and hearing of the officer in charge. Hubbs says two of them came into his store and one purchased cigars and the other chewing gum, that no other persons were in there at the time, that no conversation occurred

between him and them except what was necessary to effect the sale of the articles mentioned, that the other jurors and the deputy sheriff in charge were outside immediately in front of the store door and not more than three or four feet distant therefrom, that he and the jurors were in plain view of the remainder of the jurors and the deputy and that, on other occasions, he made sales of tobacco to one or more of the jurors under the same circumstances. Charles C. Newman states that on a day, prior to July 4th, and during the trial, he saw two of the jurors about 75 feet from the others on the street, and, in passing, one of them asked him if he was the person who was going to take them to dinner, to which he replied no and directed them to cross the street to where the others were standing. Juror Fox says he was one of the men referred to by Newman and that the jury were passing up the street, he and his comrade being the last two in the column, and that as the jury crossed a certain avenue, he and the juror with whom he was walking, passed Mr. Newman, and said other juror said to him, "Hello, are you going to take us to dinner?" to which Newman replied, "Oh, I guess not." This affiant says he and the other juror were in the rear but not apart from the main body of jurors. He does not remember the name of the other juror. Deputy Sheriff Kidder, who was then in charge of the jury, says that, as they came out of the court house yard, two of the jurors were slightly in advance of the others and started quartering across toward Tomlinson avenue, possibly twenty-five feet, when he called to them that they were getting on the wrong side of the street, and they at once joined the main body. He admits the passing of remarks between one of them and Mr. Newman.

It appears that during the afternoon of July 4th, deputy Kidder had six of the jurors at the Camp Ground until 5 o'clock, while the others were with deputy sheriff Bowman, who had them in the court house yard from about 4 o'clock until 4:30, and, after 7 o'clock, all of the jurors were in the court house yard in charge of four deputies. Mrs. C. C. Burley says the jurors in the court house yard on that afternoon were commingling indiscriminately with, and talking to, persons not jurors, in such manner that the officers could not have heard what was said, and, on one occasion or more, some of them walked to the

fence and talked to persons several minutes in the absence of
the officers and out of their keeping. Jurors Lowery and Britt
say that they and Jurors Buzzard, Koontz, Culley, and Lyons
were the only jurors in the court house yard on that occasion.
All of these except Koontz state, in their affidavits, that while
they were there no person approached any juror, that the six
jurors were not separated from each other, that they were not
without the hearing or beyond the control and custody of the
officer and that none of them walked to the fence and held con-
versation with any one. Bowman and Koontz say nothing about
what occurred there. On the evening of July 4th, while all the
jurors were in the court house yard, except Fox, whom one of
the deputies took to the barber shop, it is said by G. C. Knight
that Koontz and one other juror to him unknown, separated
themselves from the other jurors and the sheriff and engaged in
conversation with a person to the affiant unknown, for several
minutes without the hearing of the sheriff. The other juror
concerned in this was Cully. Koontz says that the man with
whom they were talking was a Mr. Addis and that while the
jurors were sitting in a sort of circle about fifteen or twenty
feet back from the fence, deputty Kidder in charge of them, he
and Culley were sitting near the fence and Addis came up
and was introduced by Culley to him, after which they spoke a
few words about the weather and crops and affiant told Addis he
was on a jury and not permitted to talk, to which Addis replied
"All right," and walked off, and, about that time, Kidder called
them back to the other jurors. Culley's statement of the inci-
dent is substantially the same. Kidder says he heard the con-
versation and states it in substance as given by Koontz and
Culley. Bowman says he was present and saw Addis come up
to the fence and it looked as if he was about to begin a conver-
sation with Kidder, observing it, attracted the attention of
Koontz and Culley, and they came back, but no conversation
occurred, for they were all within hearing if any had occurred.
Juror Boerner saw the three parties together at the fence but
does not know whether they were talking, for he was engaged at
the time in conversation with some of his fellow jurors, but he
saw one of the deputies close to them and remembers that he
called them back. He says they were not out of the hearing of
the deputy, for the latter was close to them and very near the

fence himself. Others of the jurors who were there deny that they had any conversation with any person and that they were separated from their fellows or out of the hearing of the officers. Elmer Pratt, in an affidavit filed in rebuttal, says he saw a juror standing at the front fence of the court house yard, talking to a man standing on the outside, and they were sixty feet, or more, away from the officer and other jurors, and he was closer to the persons talking than the officer and could not hear what was said, and that the conversation lasted more than five minutes. He fails to state at what time of the day this occurred.

O. A. Jenkins, on the morning of July 4th, saw Fox and one other juror separate themselves from the others and the officer, in front of a wagon shop on the street, and converse with persons unknown to alliant for a considerable time, at a point at least two hundred yards distant from the officer and other jurors. As to this, Kidder says Riggs took a step or two as if to go in a direction different from that pursued by him, saying he wanted ·to get some cigars, but was called back by him before he had proceeded any considerable distance, that he remembers seeing no person closer to Riggs than fifty feet at that time. Juror Jones states the incident as given by Kidder and says Riggs never spoke to any stranger at that time, and that he saw no person or persons there other than the jurors. Fox and Riggs, in a joint affidavit, states the circumstances as given by Kidder and Jones, and say they had no conversation there with anybody other than the jurors and have no recollection of seeing any other person near the wagon shop at that time. Jurors Lyons and Koontz state it as given by the other jurors and Kidder.

Charles C. Newman says that, on the morning of July 4th, as the jurors in charge of Bowman approached him on the street, one of the jurors walking in the rear stopped and entered into conversation with a stranger, that the sheriff did not notice the occurrence until tney reached the place where affiant was standing, that then he halted the other jurors and waited until the conversation was finished, and that he could not hear the conversation and is satisfied the officer did not, for the latter was farther away from the juror than he was. The juror was Fox, and he says the conversation was about a business matter. He owed the man with whom he was talking, Mr. Arn, some money,

and, after they had talked about it, Fox said, "I am on this case and as soon as I get off, I'll fix it up," to which Arn replied, "That will be all right." He says he told Bowman they had been talking about a hay transaction, that the deputy and other jurors stopped as soon as the conversation begun, that Bowman took a step or two towards him and Arn, that the conversation did not last more than a minute and could have been heard by Bowman and the other jurors as they were not more than eight or ten feet away and the conversation was in such tone of voice that they could easily have heard every word, and that nothing was said in connection with the case. Arn stated the incident as given by Fox and says that nothing was said about the case and he did not know at the time, nor until after his affidavit was taken, what case the jury were trying. Bowman says he heard every word of the conversation and gives it substantially as stated by Fox and Arn.

On the night of July 3, a fire occurred in Moundsville and all of the jurors in charge of deputy Kidder went to it. Kidder says he took them to a secluded corner of a yard surrounding a stable, that, at the time, there were but two other persons in the yard and not a word passed between them and any of the jurors, that, while there, William Fitzsimmons came along and asked Fox if the jury was through and Fox replied that they had been adjourned over until Thursday morning and Fitzsimmons went on, that the jury were kept together in a compact body, and, later, other people coming in the vicinity, he took the jurors to a more secluded place away from the crowd and, shortly afterwards, took them to their boarding house, and that, during the night, there was no separation of the jury and no conversation had with anybody except the few words spoken between Fitzsimmons and Fox. Fitzsimmons says he said to Fox, in substance, "How do you happen to be here, or, are you through the case?" to which Fox replied, in substance, "No, we are not through; the case was given to us for a while to-night, but we found we could not quite agree, and we were adjourned over by the judge until Thursday." He says he then turned the conversation to the subject of the fire, and had spoken a word or two, when Kidder appeared and called the jurors away to another place. He says Kidder, Fox, and the other jurors were at the fire among the people who were gathered there. Fox

says Fitzsimmons said to him, "How did the case go?" to which he replied, "We have not decided it yet," and then Kidder called them away to another place. This, he said, was all the conversation and that the jurors were not among the crowd of people at the fire, that the deputy kept them in secluded places and that they were not at the fire more than twenty or thirty minutes.

The affidavit of Howard E. Fahnestock was taken and offered, after the counter affidavits of the State had been filed, but the court refused to permit it to be filed because it was not in rebuttal and was indefinite, mentioning no names nor date, nor showing affirmatively that no officer was present on the occasion referred to. His affidavit is, in substance, that one day before the 4th day of July and during the trial of Cotts, he saw the jurors enter the court house yard and walk to the center of the lot and then two of the jurors, failing to find chairs there, walked away from the rest of them a distance of seventy-five or eighty or perhaps a hundred feet, and out of the hearing of the rest of the panel, to the fence, where they picked up two chairs near the fence and engaged in conversation with a party of four or five persons not belonging to the jury, and continued the conversation while he walked a considerable distance, which is not given in feet or in any other way to reasonably indicate what it was.

At common law, the rule requiring the jury to be kept together applied to civil as well as criminal cases, and was much more rigid and exacting than that now generally obtaining in felony cases. The reason of the rule is two-fold. It was intended to prevent intemperance on the part of the jury and accelerate the finding of a verdict; and, to this end, unless permitted by the court, they could not have meat, drink, fire, or candle until they reached an agreement, and a violation of the rule in this respect was punishable by fine. The other purpose was to prevent them from having communication with any of the parties interested and from receiving any fresh evidence in private, and any violation of the rule in these latter respects vitiated the verdict. 3 Blk. Com. 376; 4 Blk. Com. 3361.

Section 6 of chapter 159 of our Code, provides that, "After a jury in a case of felony is impaneled and sworn, they should be kept together and furnished with suitable board and lodging by the sheriff or other officer until they agree upon a verdict or are discharged by the court."

The law concerning the separation and misconduct of jurors in this State, as well as in others, is exhaustively reviewed in *State* v. *Cartright,* 20 W. Va. 32, in which the opinion of the Court was delivered by JUDGE SNYDER, and the law, as enunciated in that case, has been adhered to in all cases subsequently decided by this Court. In that case the Court held that the mere separation of the jury, after they had been empaneled, without the attendance of the officer, or misconduct of the jury in the presence of the officer, though improper and irregular, is not a sufficient cause for setting aside the verdict, and especially in cases not capital, if the court is satisfied that the prisoner has sustained no injury from such separation or misconduct. But where there has been an improper separation or misbehavior of the jury during the trial, if the verdict is against the prisoner, he is entitled to the benefit of the presumption that the irregularity has been prejudicial to him, and the burden of proof is upon the prosecution to show, beyond a reasonable doubt, that the prisoner has suffered no injury by reason of the separation or misbehavior; and if the prosecution fails to do this, the verdict should be set aside. This is also held to be the law in *State* v. *Robinson,* 20 W. Va. 713, and *State* v. *Harrison,* 36 W. Va. 729.

In *State* v. *Robinson,* 20 W. Va. 760, JUDGE JOHNSON says: "The reason why the jury is required to be kept together, deprived of social intercourse, not even allowed to visit their families without the attendance of an officer, is, because it is regarded to be absolutely necessary, to the due administration of justice; that in a criminal trial where a man's life or his liberty is committed to the keeping of a jury of his peers, it is right, that they shall be kept absolutely free from all outside influence, which might prejudice his case with the jury and do him injury.".

While it is important that the jurors, in the exercise of the grave duty, entrusted to them, should keep their minds free from business and social intercourse to the end, that they may the more carefully and effectually deliberate, it is clearly still more important and necessary, not only to the rights of the prisoner, but also to the dignity of, and maintenance of due respect for, the court and the administration of justice, that the jurors abstain, and be required to abstain, from doing any act,

or putting themselves in any situation, which might prejudice the case they have under consideration; and, for the doing of unnecessary acts, although not such as would warrant the setting aside of the verdict, but, nevertheless, of such character as clearly to excite suspicion or fear and thus bring reproach upon the administration of justice, jurors, so acting, and officers, having charge of them, permitting such conduct, ought to be fined. A fair test of whether or not the act of a juror amounts to misconduct is whether it was a necessary act or the result of a mere accident or misapprehension. It cannot be said, and is not claimed, that there was any necessity for a division of the jury in this case on July 4th, when one-half of them were taken to the Camp Ground and the other half to the court house yard or elsewhere. Nor can it be said that it was necessary or accidental that these jurors were taken to view the fire. These acts were deliberate and voluntary on the part of both officers and jurors, for which they deserve to have been severely reprimanded by the court. It is just and fair to them, however, to say that clearly they intended no wrong and their improper acts were accompanied by no evil intent. But they should have remembered that the law as well as the instructions of the court required the jurors to stay together and the officers to keep them together until they should agree upon a verdict or be discharged by the court. It may be said that there can be no separation, within the legal meaning of the term, as long as the jurors are in charge of the officers. This may be true, but it is undoubtedly true that there may be misconduct on the part of both jurors and officers, and, if juries may be divided up and separated under the charge of several deputies, without any necessity therefor, it amounts to a practical evasion of the statute and an open violation of the letter of the law, if not, indeed, the spirit of it as well.

As to the other instances of alleged misconduct, it seems that the officers endeavored to do their duty, for, in each case, the officers warned the offending jurors, reminded them of their duty, and required them to desist, except possibly in one or two instances.

What has been said about the conduct of these officers and jurors must not be taken, however, to mean that there was such a separation or misconduct of the jury as to render the verdict

vicious. To warrant the setting aside of the verdict, it is not enough, as we have seen, that there has been a mere separation of the jury, even without attendance of the officer, or that there has been misconduct of the jury in the presence of the officer. In the present state of the law, such separation or misconduct only raises a presumption in favor of the prisoner, that the irregularity has been prejudicial to him and throws upon the prosecution the burden of showing, beyond a reasonable doubt, that the prisoner has suffered no injury by reason of the separation. This rule is too firmly established in this State to be overthrown or departed from, and too well understood to permit any difference of opinion about it. Although in Pennsylvania, as appears from *Alexander* v. *Com.*, 105 Pa. St. 1, and in Missouri, as shown in *State* v. *Igo*, 21 Mo. 459, and in Iowa, as appears from *State* v. *Allen*, 39 Ia. 52, and in South Carolina, as appears from *State* v. *Way*, 38 S. C. 347, different rules obtain. The law, as adhered to in this State, governs in New Hampshire, Wisconsin, Indiana, Arkansas, and some other states. *State* v. *Prescott*, 7 N. H. 287; *State* v. *Keenen*, 8 Wis. 132; *Creek* v. *State*, 24 Ind. 154; *Cornelius* v. *State*, 12 Ark. 810; *Stanton* v. *State*, 13 Ark. 319; *Coker* v. *State*, 20 Ark. 58. In *State* v. *Cartright, supra,* JUDGE SNYDER holds this to be the proper rule as ascertained from the position generally taken by the American courts, and the policy of the law.

Another important principle, applicable to this and every other similar case, was settled in the *Cartright Case,* and that is, that while the testimony of jurors, respecting their conduct, should be received with great caution, they are, nevertheless, competent to disprove or explain any fact, misconduct or irregularity to which they have been parties, and from which, without explanation, the presumption of the impurity of the verdict arises, but their testimony cannot be received to show by what motives they were actuated or that any admitted fact, misconduct or irregularity had no influence or effect in producing the verdict, nor to impeach their verdict, but only in support of it. This rule was also followed in the cases of the *State* v. *Robinson* and the *State* v. *Harrison, supra.*

This Court has laid down no positive general rules, concerning the conduct of jurors, other than these two, but there is a sort of admission running through all the cases that, if one or

more jurors separate themselves from the others, but are attended by an officer, such fact does not amount to a separation of the jury in the legal signification of the term. In syllabus 3 of the *Cartright Case,* the Court uses this language: "A mere separation of the jury, after they have been empaneled, without the attendance of the officer." Hence, the improper separation, contemplated in the rule there laid down, and from which it is held that a presumption of the impurity of the verdict arises, is not a separation of jurors attended by an officer, but of jurors who are not so attended. In *State* v. *Robinson, supra,* the Court, as shown by the syllabus and opinion, seem to have attached great weight to the fact that the two jurors, who went into the water-closet, in whch there were strangers, were not accompanied by the officer. In *State* v. *Hall,* 31 W. Va. 505, JUDGE JOHNSON says, at page 508, "The preponderance of the affidavits clearly shows that the juror was at no time out of sight of his fellow jurymen, nor out of sight of the officer in charge, and spoke to no one. This was not a separation of the jury." From this, the natural inference is, that if the officer had attended them, their action would not have been deemed a separation. In *State* v. *Harrison, supra,* the Court evidently regards it as important that the sheriff went with the juror into the hall leading to the closet and saw that no one was in the hall, satisfied himself that no one was in the closet, and upon returning to bed listened until the juror returned. If the purpose of keeping the jury together is only to keep them free from all outside influence which might prejudice the case of the prisoner, it would be immaterial whether the jurors are kept in a compact body or divided, each part being under the care of an officer, if the officer permitted no person to approach or communicate with the jurors under his care, nor permitted them to hear or see anything, calculated to influence them in arriving at a verdict. Such a separation, if unnecessary, would be improper, as giving rise to suspicion and criticism, but not an improper separation within the meaning of the rule laid down by this Court, such as would invalidate the verdict. In *McCaul's Case,* 1 Va. Cases 271, Judge Nelson says one view of the subject was, that the law required the jury to be kept entirely inaccessible so that communication with them would be impossible, and that the other was that mere separa-

tion, unless it be proved that there has been some conversation verdict; but he said the court was not called upon to decide between the two views, and would decide only whether the separation in that particular case should overthrow the verdict.
or tampering with a member of the jury, shall not vitiate the

Proceeding now to consider, in the light of the foregoing principles, the specific acts complained of in this case, and giving credit to the testimony of the jurors and officers, it is found that the incident, first mentioned by Mr. Newman, was harmless, even if he is correct in all he says about it. The remark of the juror to him could not have influenced his verdict, although it was improper as showing a want of decorum on the part of the juror. There is a preponderance of evidence in behalf of the prosecution as to the distance of these two jurors from the main body of jurors on that occasion, showing that Mr. Newman is probably in error as to the distance. The division of the jurors on the 4th day of July was an impropriety on the part of both jurors and officers because it was useless, unnecessary, and violative of the law and instruction of the court, but it did not amount to an improper separation, raising a presumption against the purity of the verdict. Notwithstanding the division, all the jurors remained in the care, custody, and charge of proper officers, and under the principles and precedents established by this Court, it did not constitute a separation of the jury. Nor was it such misbehavior as is likely to have affected the verdict to the prejudice of the prisoner, and therefore raise a presumption in his favor. But, if it were such misbehavior, the presumption is repelled and fully rebutted by the testimony of the jurors and officers, all of whom, with one or two exceptions, say that in neither of the parties of jurors did any of them hold any conversation that afternoon with strangers or persons not jurors. Nobody testifies that anything occurred at the Camp Ground which might have influenced the six jurors who went there, and all of them say they did not separate from each other nor talk to anybody nor go out of the hearing and custody of the officer. As to those who were at the court house, only Mrs. Burley and possibly Pratt testified to any misconduct. Against these two witnesses stand the affidavits of five of the six jurors who were there. The nature of the conversation had by Koontz, Culley,

and Addis at the fence in the evening is disclosed. Three witnesses give the conversation in full and they agree as to what it was, and it was clearly of such character as could not have affected the verdict in any way. But for this explanation, however, the fact that the conversation took place between these parties would have necessitated the setting aside of the verdict, because the presumption would be that it was a conversation such as might have influenced the jurors. It made it necessary for the prosecution to show that it was not such a conversation. This has been shown, beyond a reasonable doubt, and the verdict cannot be set aside on account of this transaction.

These observations apply also to the conversation between juror Fox and Mr. Arn. Even if it occurred out of the hearing of the officer, as is claimed by Mr. Newman, the conversation was harmless, but the act of the juror was improper, and, unexplained, would have been cause for setting the verdict aside. The presumption that anything occurred at the fire except the indiscrete remark of juror Fox to Fitzsimmons, even if the latter understood and remembered it correctly, is precluded by the testimony of Fox and Kidder. It is not claimed that any person, other than Fitzsimmons, spoke to any of the jurors on that occasion, and what he said to this juror was certainly harmless and could not have influenced him one way or another in respect to the verdict. What he says Fox said to him, while improper and indecorous, if true, although in answer to a question, was clearly not, in any sense, the exercise of any outside influence upon him. It was the act of the juror himself and not the act of some other person likely to have affected his verdict. The natural inclination being to answer a question propounded, it is quite probable that the disclosure of the attitude of the jury, if made, was merely a thoughtless remark and free from any wrongful intent. As to what occurred at the cigar store, all the testimony offered comes from persons who were not jurors, and the affidavit of Hubbs is more satisfactory than the other, for it states the transaction in detail and gives the particulars of it, while the other is general. It is unnecessary to determine whether the jurors, while in the store, were out of the hearing of the officer and therefore, had separated themselves from the jury in the technical sense of that term, for it is made certain

by the affidavit of Hubbs that nothing occurred in the store that could have influenced them in reference to the verdict.

Against the testimony of Mr. Jenkins, the record shows the affidavits of the officers, and the two jurors concerned and three other jurors, making six persons, whose testimony give the occurrence in front of the wagon shop an entirely different character from that given to it by Jenkins, thus showing that he must have been under a misapprehension as to what happened there. The affidavit of Fahnestock was properly excluded because of its indefiniteness. It should have shown who the jurors in question were, or to whom they talked, or when it occurred, so the prosecution could have had some fact by which to follow up, identify and explain the fact or contradict the testimony. In *Cornelius* v. *State,* 12 Ark. 810, there was evidence that some of the jurors had been seen, during the trial, separated from their fellows and walking in the street, but it did not appear who they were, and the court held that it should have been shown who they were, for, without that information, the State could not have negatived the presumption of influence.

It may be remarked, supplementarily, as applicable to at least two of the circumstances relied upon by the plaintiff in error as misconduct on the part of the jury, that this Court has decided, in the case of the *State* v. *Harrison,* 36 W. Va. 729, that a "mere business conversation by a juror with another person, entirely foreign to the case on trial, in the presence and hearing of the sheriff and other jurors, will not avoid the verdict;" but, in the opinion, the Court characterizes it as reprehensible in a sheriff in charge of a jury to allow conversation or transaction of business between jurors and other persons. To some other incidents, so relied upon, the decision of the court in the case of the *State* v. *Belknap,* 39 W. Va. 428, is applicable. It is held that "If the court can see that the officers who had the jury in charge kept them together within the practical meaning of the rule and have not spoken to them themselves, nor suffered any other person to speak to them touching any matter relative to the trial, until they have returned again into court, that is sufficient, although it may be that in leaving the court house and returning, they were separated somewhat more than is usual and passed within hearing of persons talking on other subjects."

Thus, applying the rule sanctioned by this Court, allowing

jurors to testify, within certain limits, in support of their verdict, and, adhering to the law as heretofore established and followed in this State, respecting the conduct of jurors as affecting the verdict, the conclusion is irresistable that the court below did not err in refusing to set aside the verdict and grant a new trial because of the alleged separation and misconduct of the jury. There is no error in the judgment, and it must be affirmed.

*Affirmed.*