State Of West Virginia

*v.*

Noble Lee Cobb

(No. 14069)

Decided December 2, 1980.

*Stephen Jon Ahlgren* for plaintiff in error.

*Chauncey H. Browning*, Attorney General, *Marianne Hoover*, Assistant Attorney General, for dependent in error.

NEELY, CHIEF JUSTICE:

The defendant, Noble Lee Cobb, was convicted of voluntary manslaughter in the Circuit Court of Clay County on 2 August 1976. His primary assignment of error is that the circuit court denied him an instruction on involuntary manslaughter because, according to the court's ruling, the evidence did not support the instruction. The defendant took the stand and admitted killing the victim, Anthony Frazier, with a deadly weapon. His defense, however, was based on two alternative theories: first, self-defense; and second, negligent use of non-deadly force, which constitutes involuntary manslaughter. Since one of the defendant's theories was that he was in the process of doing a lawful act, namely attempting to scare off an attacker by shooting over his head, and since the defendant introduced evidence in support of this theory, we conclude that the defendant was entitled to an instruction on involuntary manslaughter. We, therefore, reverse and remand for a new trial.

On 19 June 1976 the defendant, his wife, and a third party, Robert Stephenson, were camping in a Volkswagen camper on the grounds of a private farm in Clay County, West Virginia. The defendant, a Clay County native who no longer resided there, had returned to the area on a fishing trip. Sometime during the night, between 3:00 a.m. and 4:30 a.m., the defendant's group was awakened by a rowdy, menacing group of seven persons who pulled up in a station wagon right beside the camper. According to their own testimony, the newly-arrived group had been drinking heavily all night long until the bars closed, and they had intended to go out to a nearby cemetery to continue their drinking, but having missed the turn, they inadvertently came to the farm.

The evidence concerning what transpired after the arrival of the second group is contradictory. While it is uncertain what exactly was said by whom, it is clear that shortly after arriving the group began yelling obscenities and threats.[1] The defendant testified that they shouted that they would burn him out of the camper and that they had a gun and would shoot him out if need be. While the group admitted to yelling obscenities, they protested that they were merely having fun and were not intending any harm.

The testimony does not reveal how long the group harassed the campers, but does show that they were there for sufficient time to allow a couple who had initially gone

---

[1] A review of the witnesses' testimony confirms that the group was indeed doing more than acting in a disorderly fashion. One member of the victim's group, Betty Jo Cutlip, shouted to the inhabitants of the trailer: "Wake up you mother f . . . . . . and let's crack a d. . . ." The defendant testified that when the group arrived they parked next to his camper and slammed their car door against the side of the camper. Someone then shouted "Hey, get out of there you mother f . . . . . . and let's crack a d. . . ." Someone else said "Somebody shake their f . . . . . . a. . . . out of there. If they don't like it they can get out. It's my land anyway." A man's voice then shouted, "We ain't scared of no mother f . . . . . ." Again, someone shouted, "I'll bring their f . . . . . a . . . . out of there, I've got a gun." The defendant testified that after he had gotten out of the camper, the victim "took a couple of steps around the car . . . he pointed his finger at me and told me, he said, 'I'm going to run the gun up your a. . mother f . . . . . . .'"

off behind the barn "to neck," to return and report that they were planning to continue that activity. Thelma Jean, a distant cousin of the defendant, was the woman out behind the barn "necking." The defendant, who recognized the voices of many of the group, but who had remained silent in his camper throughout the episode, shortly thereafter yelled, "Get Thelma Jean and get out."

According to the defendant's testimony. the group ignored his requests for them to leave. In order to emphasize his request, the defendant fired a shot over the car with his hunting rifle. When the group continued to laugh, according to the defendant, he fired a second shot through the window of the unoccupied rear of the station wagon. According to the defendant, the victim, Anthony Frazier, then got out of the front of the car, made a threatening statement and took two steps toward the camper, whereupon the defendant claimed he tried to fire another warning shot over the victim's head. The victim was struck in the chest and killed.

While the defendant strenuously argued that the killing was totally excusable as a legitimate exercise in self-defense, he never admitted that he intended to kill the victim. He testified that he was in fear of an assault by the victim and his friends; that they had threatened to burn his camper; and, that he brought out his rifle for the purpose of frightening his would-be assailants.[2] The defendant testified that he aimed over the head of the victim and that the bullet accidentally struck the victim and killed him.

---

[2] In an attempt to determine the defendant's state of mind as a result of his encounter with the intruders, the following testimony was elicited from the defendant on direct examination:

Q. Did they put you in fear of your safety?
A. Yes, they did.
A. Yes sir, I was scared. I will admit it.
Q. What actions, specifically, scared you?
A. Well when she, when Punk Greene said she had a gun and when they said they was going to burn me up scared me the worst.

I

Regardless of how incredible the defendant's theory of the case was, nonetheless, the defendant's own testimony introduced some evidence in support of his theory of negligent homicide, or involuntary manslaughter.[3] The theory basically included the following elements: (1) The defendant had as much right to be on the property where the altercation occurred as the victim and immediately before the homicide the defendant had been peacefully camping with his companions; (2) the defendant's sleep was interrupted by abusive language and threats of violence which the defendant alleged put him in fear of his own personal safety; (3) the defendant lawfully had in his possession a hunting rifle with which he lawfully armed himself for self-defense; (4) the defendant emerged from his camper with the lawful intention of using non-deadly force, to-wit, the brandishment of his loaded weapon and the firing of shots over the heads of his would-be assailants in an attempt to repel the attack; and, (5) in the execution of defendant's lawful act, namely, the use of non-deadly force to repel the attack, the defendant negligently killed the victim.

The whole issue of an accidental killing where one party is attempting to use non-deadly force to repel an attack has been handled in *Valentine v. Commonwealth,* 187 Va. 946, 952-53, 48 S.E.2d 264, 267-68 (1948) where the Virginia court said:

> The distinction between killing in self-defense proper and accidental or unintentional killing while in the exercise of self-defense is set forth in 40 C.J.S., Homicide, page 981, § 112c. There it is said:
>
> 'Ordinarily the law of self-defense is not applicable in a case of a killing resulting from an act which was accidental and unintentional, particularly where the facts of the case are not such as would make such law applicable. However, where the

---

[3] We would note in passing that even the State must have believed there was some evidence of involuntary manslaughter since they included an instruction on involuntary manslaughter which was removed by the trial judge.

defense of excusable homicide by misadventure is relied on, the principles of self-defense may be involved, not for the purpose of establishing defense of self, but for the purpose of determining whether accused was or was not at the time engaged in a lawful act; and it has been held that in such case the right, but not the law, of self-defense is invoked. Accused is entitled to an acquittal where he was lawfully acting in self-defense and the death of his assailant resulted from accident or misadventure, as where in falling he struck or overturned an object and thereby received injuries resulting in his death, or where in a struggle over the possession of a weapon it was accidentally discharged.'

In the same case the Virginia court cited *Wharton's Criminal Law*, Vol. 1, 12th Ed., §§ 623 and 624 and said:

In other words, when a man kills another in an honest error of fact, murder is out of the question. The only issue is was this error negligent or non-negligent? If negligent, the killing is manslaughter. If non-negligent, excusable homicide. 187 Va. at 953, 48 S.E.2d at 268.

The classic definition of involuntary manslaughter can be found in *State v. Barker*, 128 W.Va. 744, 38 S.E.2d 346, syl. pt. 7 (1946):

The offense of involuntary manslaughter is committed when a person, while engaged in an unlawful act, unintentionally causes the death of another, or where a person engaged in a lawful act, unlawfully causes the death of another.[4]

The jury in the case before us obviously concluded that the homicide was not excusable as a proper exercise in self-defense. If the jury believed that the defendant could have formulated no reasonable belief of danger of death or great bodily harm, his use of deadly force would then have

---

[4] This definition comports with *State v. Lough*, 143 W.Va. 838, 105 S.E.2d 538, (1958); *State v. Bail*, 140 W.Va. 680, 88 S.E.2d 634, (1955); *State v. Comstock*, 137 W.Va. 152, 70 S.E.2d 648, (1952); and, *State v. Lawson*, 128 W.Va. 136, 36 S.E.2d 26 (1945). *Accord, Mundy v. Commonwealth*, 144 Va. 609, 615, 131 S.E. 242, 244 (1926).

been impermissible. Nonetheless, the defendant could lawfully have used non-deadly force (a perfectly lawful act), and in the process of doing this lawful act, he may have negligently caused the death of the victim. We cannot conclude, as the trial court obviously did, that the defendant's brandishment of a loaded weapon under the circumstances was *per se* an unlawful and felonious act.[5] Accordingly, the trial court should have afforded the defendant an instruction on involuntary manslaughter.

## II

This Court has not yet spoken to the proper procedure to be used upon retrial of a case such as this where the evidence would support a jury verdict ranging from first degree murder to not guilty. In cases of this type the jury evaluates all the gradations of homicide and settles upon the one which, after extensive discussion, meets with unanimous approval. Obviously, under our ruling in *State v. Eden*, 163 W.Va. 370, 256 S.E.2d 868 (1979), and under *Green v. U.S.*, 355 U.S. 184, 78 S.Ct. 221 (1957), 2 L.Ed.2d, 78 S.Ct. 221 (1957), it is impermissible for the court on retrial to accept any verdict more severe than the original conviction. That, however, does not mean that the jury cannot be instructed as it was in the original trial upon all the theories of homicide which the evidence will support. Since the evidence in the case before us would support a conviction of first degree murder, it is unfair to the State to limit the jury's consideration of verdicts to voluntary manslaughter, involuntary manslaughter, and not guilty. If upon retrial, the jury returns a verdict for a crime greater than voluntary manslaughter, under *Green, supra*, the trial court must enter judgment upon the verdict for voluntary manslaughter.

---

[5] We note that while our jurisdiction has not considered the issue of an accidental killing where one party is attempting to use non-deadly force to repel an attack, we have held on numerous occasions that where there is competent evidence tending to support a theory of self-defense, it is error for the trial court to refuse to give a proper instruction presenting such theory when requested to do so. *State v. Hayes*, 136 W.Va. 199, 67 S.E.2d 9 (1951); *State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972); and, *State v. Green*, 157 W.Va. 1031, 206 S.E.2d 923 (1974).

72

For the reasons set forth above the judgment of the Circuit Court of Clay County is reversed and the case is remanded for a new trial.

*Reversed and remanded.*