311 S.E.2d 118

**STATE of West Virginia**

v.

**John Lewis YOUNG.**

**No. 15785.**

Supreme Court of Appeals of West Virginia.

Nov. 10, 1983.

Concurring Opinion Dec. 19, 1983.

Stephen C. Littlepage, Point Pleasant, for appellant.

Chauncey H. Browning, Jr., Atty. Gen. and Fredrick S. Wilkerson and Janet Frye Steele, Asst. Attys. Gen., Charleston, for appellee.

McGRAW, Chief Justice:

John Lewis Young appeals his conviction of first degree murder rendered by jury verdict on December 18, 1981, in the Circuit Court of Mason County. The appellant makes ten assignments of error, which have been consolidated into seven arguments for purposes of appeal: 1) the trial court erred in imposing a harsher sentence upon retrial than that imposed at the original trial of the appellant; 2) the trial court erred in denying the appellant's motion for a change of venue; 3) the trial court erred in refusing to sequester the jury; 4) the trial court erred in permitting a photograph of the deceased victim's remains to be entered into evidence and displayed to the jury; 5) the trial court erred in admitting into evidence certain exhibits, when the State failed to establish a proper chain of custody or to otherwise connect them to the appellant; 6) the trial court erred in admitting into evidence two copies of a confession purportedly signed by the appellant; and 7) the trial court erred in permitting the State to proceed upon a felony-murder theory. We find merit in the appellant's first assignment of error, and, therefore remand the case for resentencing of the appellant.

In January of 1977, the appellant was indicted by the Mason County Grand Jury for the murder of Mary Lucille Berry. Trial was originally scheduled in the Circuit Court of Mason County. However, after several unsuccessful attempts to secure an impartial panel of prospective jurors, the proceedings were transferred to the Circuit Court of Wood County, where in November of 1977 the appellant was convicted of second degree murder. The appellant was subsequently sentenced to a term of five to eighteen years in the State Penitentiary at Moundsville.

On March 26, 1981, the United States District Court for the Northern District of West Virginia entered an order granting the appellant's petition for a writ of habeas corpus on the grounds that an instruction given at the appellant's trial was essentially identical with an instruction found to be reversible error in *State v. O'Connell,* 163 W.Va. 366, 256 S.E.2d 429 (1979). The court stayed execution of the writ for ninety days to permit the State to retry the appellant.

Prior to retrial, the circuit court denied the appellant's motion for a change of venue and his motion to sequester the jury. The appellant's retrial lasted nine days. The most significant evidence against the appellant consisted of the testimony of Terry Brainard, the appellant's nephew and alleged accomplice. Brainard testified that he and the appellant went to the home of the victim in order to rob her. They forced their way into the house and the appellant took Mrs. Berry upstairs where he sexually assaulted her, and then killed her, while Brainard searched downstairs for money. Also admitted into evidence were two copies of a confession which the appellant had signed, admitting that he had killed Mrs. Berry. The appellant's defense consisted primarily of an attempt to show diminished capacity by reason of intoxication and to implicate Brainard, and not the appellant, as the killer.

At the conclusion of the nine-day trial, the jury found the appellant guilty of murder in the first degree. The jury verdict did not include a recommendation of mercy. The trial court subsequently sentenced the appellant to confinement in the penitentiary for the balance of his natural life. The court denied the appellant's motion to reduce the sentence to one no greater than imposed upon the appellant at his original trial.

I.

■ In his first assignment of error, the appellant protests the imposition of a harsher sentence upon retrial than that imposed pursuant to his original conviction. The appellant argues that the imposition of the harsher sentence is a violation of the double jeopardy provisions of the fifth and fourteenth amendments to the United States Constitution.

The propriety of imposing a harsher sentence upon retrial of a criminal defendant has been recently considered by this Court on three different occasions. In *State v.*

*Eden,* 163 W.Va. 370, 256 S.E.2d 868 (1979), the defendant was originally found guilty of reckless driving in a justice of the peace court and was fined fifty dollars. He then applied for a trial *de novo* in circuit court. The trial *de novo* resulted in a jury verdict of guilty, and the court imposed a thirty day sentence and a fine of two hundred dollars. On appeal, this Court held that the imposition of a harsher sentence by the circuit court than that imposed by the justice of the peace court constituted a violation of due process.[1] In so ruling, the Court relied upon the decision of the United States Supreme Court in *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), and the decision of the Fourth Circuit in *Patton v. North Carolina,* 381 F.2d 636 (4th Cir. 1967), *cert. denied,* 390 U.S. 905, 88 S.Ct. 818, 19 L.Ed.2d 871 (1968).

In discussing *Patton* and *Pearce,* the Court stated:

> In *Patton* the Fourth Circuit dismissed as simplistic the legal fiction that in seeking and obtaining a new trial the defendant is deemed to have consented to a complete eradication of the consequences of his first trial. The court found that conditioning the defendant's constitutional right to appeal from an invalid conviction on the notion that he has consented to a possible increase in punishment violates due process. Besides placing on the right to appeal an impermissible burden which could deter individuals from challenging invalid convictions, increased sentencing could be used vindictively to punish defendants for having the temerity to seek and obtain new trials. Even in cases where additional evidence which might justify increased punishment was introduced at retrial, the impossibility of determining improper motivation necessitated that protection of a defendant's rights outweigh the danger of inadequate sentencing. To avoid "even the appear*ance*" (emphasis in the original) of vindicative motivation, *Patton* laid out a blanket prohibition on imposing increased sentences at retrial. We agree with this view.

> In *Pearce* the United States Supreme Court, after dismissing the idea that increased sentencing is absolutely barred by the U.S. Constitution, noted that "[t]his Court has never held that the States are required to establish avenues of appellate review, but it is now fundamental that, once established, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts." The fear of increased sentencing on retrial as punishment for prosecuting an appeal from his conviction fetters the defendant's exercise of his right to appeal and violates due process, even in cases of nonconstitutional error. However, *Pearce,* while condemning punitive increases in sentencing on retrial, stopped short of prohibiting imposition of heavier sentences in all cases.

163 W.Va. at 378–380, 256 S.E.2d at 873–874 (footnotes omitted). Following *Patton,* we held in *State v. Eden,* 163 W.Va. at 384, 256 S.E.2d at 876, that "upon a defendant's conviction at retrial following prosecution of a successful appeal, imposition by the sentencing court of an increased sentence violates due process and the original sentence must act as a ceiling above which no additional penalty is permitted."

Our next case addressing this issue is *State v. Cobb,* 166 W.Va. 65, 272 S.E.2d 467

---

1. The post-conviction relief provided by statute to a defendant convicted in justice of the peace court was the right to a new trial in circuit court. *See* W.Va.Code § 50–18–10 [1965] (Repealed 1976). This two-tiered system has been retained with regard to magistrate courts. *See* W.Va.Code § 50–5–13 (1980 Replacement Vol.). In *Eden* we did not consider the question of whether the right guaranteed by statute to remove the case to the circuit court for trial *de novo* is actually on appeal, since that issue was neither raised nor briefed. 163 W.Va. at 868, n.

19, 256 S.E.2d at 876, n. 19. Accordingly, in *Eden,* trial *de novo* was considered the only available remedy through which the defendant could challenge his conviction. Were the law to provide an alternative avenue of relief other than trial *de novo,* the result obtained in *Eden* might not apply. A convicted defendant who, waging the law in hopes of an acquittal, chooses a trial *de novo* rather than an appeal, could be deemed undeserving of the protection afforded by the rule adopted in *Eden.*

(1980). The defendant in *Cobb* was convicted of voluntary manslaughter. He appealed, alleging error in the trial court's refusal of a proffered instruction on involuntary manslaughter. Upon review of the record, this Court reversed the defendant's conviction on grounds that the involuntary manslaughter instruction should have been given. Writing for the Court, Justice Neely, while commenting upon the proper procedure to be followed at retrial, stated:

> This Court has not yet spoken to the proper procedure to be used upon retrial of a case such as this where the evidence would support a jury verdict ranging from first degree murder to not guilty. In cases of this type the jury evaluates all the gradations of homicide and settles upon the one which, after extensive discussion, meets with unanimous approval. Obviously, under our ruling in *State v. Eden*, 163 W.Va. 370, 256 S.E.2d 868 (1979), and under *Green v. U.S.*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), it is impermissible for the court on retrial to accept any verdict more severe than the original conviction. That, however, does not mean that the jury cannot be instructed as it was in the original trial upon all the theories of homicide which the evidence will support. Since the evidence in the case before us would support a conviction of first degree murder, it is unfair to the State to limit the jury's consideration of verdicts to voluntary manslaughter, involuntary manslaughter, and not guilty. If upon retrial, the jury returns a verdict for a crime greater than voluntary manslaughter, under *Green, supra*, the trial court must enter judgment upon the verdict for voluntary manslaughter.

166 W.Va. at 71, 272 S.E.2d at 471.

In *Green v. United States, supra*, the United States Supreme Court decision relied upon in *Cobb*, the defendant was originally convicted of second-degree murder under an indictment charging murder in the first degree. This conviction was reversed on appeal. On remand the defendant was tried again for first degree murder under the original indictment. He was found guilty of first degree murder and sentenced to death. The Court of Appeals affirmed. On certiorari, the United States Supreme Court reversed the defendant's conviction for first degree murder, holding that the second trial on this charge placed the defendant twice in jeopardy for the same offense. Justice Black, writing for the majority, rested the Court's decision, in part, on the grounds that the jury's verdict in the defendant's original trial constituted an implicit acquittal on the charge of first degree murder. Further, the Court held that the defendant's successful appeal did not amount to a waiver of his defense of former jeopardy.

Our most recent case discussing the imposition of a harsher sentence upon retrial following a successful appeal is *State v. Gwinn*, 169 W.Va. 456, 288 S.E.2d 533 (1982). In *Gwinn*, the defendant was initially convicted of first degree murder with a recommendation of mercy. Upon retrial following post-conviction *habeas corpus* relief, he was convicted of first degree murder without a recommendation of mercy, and was sentenced to life in the penitentiary without chance of parole. On appeal, the defendant raised two assignments of error regarding the imposition of a harsher sentence at retrial. First, he contended that it was error for the trial court to refuse to instruct the jury that they could not return a verdict providing for punishment in excess of murder in the first degree with a recommendation of mercy. The Court, in accordance with the rule set out in *State v. Cobb, supra*, held this assignment of error to be without merit. In his second assignment of error, the defendant contended that it was error for the trial court not to sentence him pursuant to a recommendation of mercy. This issue, however, was rendered moot when, subsequent to the filing of the defendant's petition for appeal, the governor commuted the defendant's life sentence to a term of five to eighteen years. Nevertheless, the Court did state that "[u]nder our holdings in *Eden* and *Cobb* the trial court's imposition of a greater penalty than that imposed at the appellant's first trial is clearly erroneous." 169 W.Va. at 461, 288 S.E.2d at 537.

In the case at bar, the trial court's imposition of sentence pursuant to the jury verdict of first degree murder rendered at retrial, rather than pursuant to the verdict of second degree murder rendered at the original trial, constitutes plain error under *Eden* and *Cobb*, as well as *Green v. United States, supra*. However, the State urges the Court to set aside its previous holdings in light of the United States Supreme Court's decision in *Chaffin v. Stynchcombe*, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973). In *Chaffin*, the defendant was convicted of robbery in a Georgia criminal court and, pursuant to Georgia procedure, was sentenced by the jury to fifteen years in prison. The defendant was subsequently granted habeas corpus relief. After retrial before a different judge and jury, the defendant was reconvicted of robbery. The jury, which was aware of the previous trial but not of the prior fifteen year sentence, imposed a sentence of life imprisonment on the defendant. After his conviction was affirmed by the Georgia Supreme Court, the defendant sought habeas corpus relief contending that the imposition of the higher sentence on retrial violated his due process rights. The district court denied relief and the Fifth Circuit affirmed.

On certiorari to the United States Supreme Court, the defendant made three distinct due process claims: (1) higher sentences on retrial violate the double jeopardy prohibition of the fifth amendment, made binding upon the states through the due process clause of the fourteenth amendment; (2) higher sentences on retrial occasioned by vindictiveness violate traditional criminal law concepts of fairness; and (3) the possibility of a higher sentence has an impermissible chilling effect on a defendant's right to challenge his conviction by appeal or by collateral attack. Addressing each of these issues, a five member majority of the court held: (1) a harsher sentence on reconviction for the same offense does not violate the double jeopardy clause; (2) there was no danger of vindictiveness because the jury was not informed of the defendant's prior sentence; and (3) the possible chilling effect occasioned by the possibility of a harsher sentence does not place an impermissible burden on the right of a criminal defendant to appeal or collaterally attack his conviction.

While *Chaffin* undermines the rationale of *Patton v. North Carolina, supra*, relied upon by this Court in *State v. Eden, supra*, and contradicts dicta in *State v. Gwinn, supra*, it is not controlling in the case at bar because the appellant herein was not reconvicted of the "same offense" as was the defendant in *Chaffin*. Rather, the appellant was initially convicted of second degree murder; upon retrial he was convicted of first degree murder. *Green v. United States, supra*, governs this situation. Because the jury at the appellant's initial trial had the option of returning a verdict for first degree murder, under *Green*, the conviction for the lesser included offense of second degree murder is to be viewed as an implicit acquittal on the charge of first degree murder, thus precluding a second prosecution on this charge.

The *Green* rationale continues to be followed by the United States Supreme Court. *See, e.g., Price v. Georgia*, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970). *See also, Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). *Cf. Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981); *United States v. DiFrancesco*, 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980). Accordingly, we decline the State's invitation to set aside our holdings in *State v. Eden, supra*, and *State v. Cobb, supra*. We hold that upon retrial of a criminal defendant, who had previously been convicted of second degree murder under a general homicide indictment, the court may not impose judgment for a more serious degree of homicide than that imposed at the original trial. *Green v. United States, supra; State v. Cobb, supra; State v. Eden, supra*.

## II.

The appellant next contends that the trial court committed reversible error by refusing to grant a change of venue. The ability of a trial court in a proper case to

move the location of trial to a county different from that in which the alleged offense occurred flows from article III, section 14 of the West Virginia Constitution, which provides, in pertinent part: "Trials of crimes, and misdemeanors, ... shall be by a jury of twelve men, public, without unreasonable delay, and in the county where the alleged offence was committed, unless upon petition of the accused, and for good cause shown, it is removed to some other county." This constitutional rule has also been codified by the Legislature. W.Va.Code § 62–3–13 (1977 Replacement Vol.), provides, in pertinent part: "A court may, on the petition of the accused and for good cause shown, order the venue of the trial of a criminal case in such court to be removed to some other county."

■ As the language of these constitutional and statutory provisions indicate, a showing of good cause must be made in order to warrant a change of venue, and the burden of making such showing rests upon the defendant. *See, e.g., State v. Pratt,* 161 W.Va. 530, 244 S.E.2d 227 (1978); *State v. Sette,* 161 W.Va. 384, 242 S.E.2d 464 (1978). "Good cause shown" for a change of venue, as the phrase is used in W.Va. Const. art. III, § 14, and W.Va.Code § 62–3–13, has been interpreted by this Court to mean proof that the defendant cannot get a fair trial in the county where the offense occurred as a result of extensive present hostile sentiment against him. *State v. Pratt, supra.*

The appellant contends that pretrial publicity concerning the death of Mrs. Berry, the appellant's initial conviction, and his subsequent habeas corpus relief and retrial, precluded him from receiving a fair trial in Mason County. In support of his motion for a change of venue, the appellant presented ten exhibits to the trial court. The exhibits consisted of various newspaper articles published in the *Point Pleasant Register,* a newspaper of general circulation in Mason County. Nine of the articles were published between December 1, 1976 and February 15, 1977. They relate accounts of the death of Mrs. Berry and the appellant's subsequent arrest. The tenth article was published on December 8, 1981, following the first day of jury selection for the appellant's retrial. The text of this article is set out in the margin.[2] In addition to these newspaper articles, the appellant also tendered two affidavits from citizens in Mason County stating that public sentiment and hostility precluded the appellant from receiving a fair trial. After considering this, and other evidence,[3] the trial court denied the motion for a change of venue.

■ The Court has previously held that "[w]idespread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against him is so great that he cannot get a fair trial." Syllabus Point 1, *State v. Gangwer,* 169 W.Va. 177, 286 S.E.2d 389 (1982). *See also State v. Hall,* 171 W.Va. 212, 298 S.E.2d 246 (1982); *State v. Pratt, supra; State v. Hamric,* 151 W.Va. 1, 151 S.E.2d 252 (1966). Thus, while "[a] change of venue will be granted in West Virginia when it is shown that there is 'a present hostile sentiment against an accused, extending throughout the entire county in which he is brought to trial ...,' " syllabus point 1, *State v. Peacher,* 167 W.Va. 540,

---

2. Jury selection was scheduled to begin today in Mason County in the retrial of John Lewis Young, 32, of Mason, charged in the Dec. 1, 1976, stabbing death of 58-year-old Mary L. Berry, also of Mason.

Young, who was convicted of second degree murder in connection with the crime in November, 1977, was released from the West Virginia State penitentiary on a writ of habeas corpus in March by U.S. District Court Judge Charles H. Haden, II, of Wheeling. According to Mason County Prosecuting Attorney Damon B. Morgan, Jr., the judge granted the writ apparently due to an improper instruction made to the jury by the judge at the original trial which, because of publicity surrounding the case, was held in Wood County. Judge Haden did, however, give the State the option of re-trying Young on the same charge on which he was convicted a first time.

3. Two additional newspaper articles published in 1981 were presented below. Also twenty-seven affidavits from residents of Mason County were presented by the prosecution. These exhibits have not been attached to the appellate record.

280 S.E.2d 559 (1981) (quoting syllabus point 1, *State v. Siers*, 103 W.Va. 30, 136 S.E. 503 (1927)), the mere existence of pretrial publicity concerning the alleged offense is insufficient to warrant a change of venue. Rather, the publicity must be shown to have so pervaded the populace of the county in such a manner as to preclude a fair trial. *See State v. Boyd*, 167 W.Va. 385, 280 S.E.2d 669 (1981). *See also State v. Goodmon*, 170 W.Va. 123, 290 S.E.2d 260 (1981).[4]

Whether the showing made by the defendant is sufficient to warrant a change of venue normally rests in the sound discretion of the trial court, and its ruling thereon will not be disturbed unless it clearly appears that such discretion has been abused. *State v. Hall, supra; State v. Gangwer, supra; State v. Pratt, supra; State v. Sette, supra.* While this case is close, we find no such clear abuse of discretion here. Of the panel of twenty-eight prospective jurors impanelled to hear the appellant's case, twelve neither saw nor heard any media coverage of the case. Seven of the prospective jurors saw the 1977 newspaper articles. Three had seen only the article published on December 8, 1981. Four had read articles both in 1976 and 1981, and two had read only related newspaper headlines. The court extensively and separately questioned each of the prospective jurors as to whether they were prejudiced by media coverage, and each replied negatively. We are unpersuaded by the fact alone that a change of venue was granted at the appellant's initial trial. Good cause for a change of venue must be shown to exist at the time the motion for the change of venue is made. *See State v. Pratt, supra; State v. Sette, supra.*

### III.

In his third assignment of error, the appellant protests the refusal of the lower court to sequester the jury during trial.

The appellant made two motions for sequestration below. The first motion was made during the second day of individual voir dire of the jury panel when it became apparent that several of the prospective jurors had read an article published the previous day in the *Point Pleasant Register* discussing the appellant's initial conviction and his subsequent habeas corpus relief.[5] At this time the appellant requested that all prospective jurors be sequested. The trial court denied the motion. Defense counsel did not object to the denial of the motion, but did request that the court specifically question each prospective juror on voir dire whether they had read the newspaper article, which the court agreed to do.

The appellant's second motion for sequestration of the jury was made at the beginning of the fourth day of trial, after the jury had been selected, but before the opening remarks of counsel. This motion was also denied by the trial court. Counsel "strenuously objected" to its denial. On appeal, the appellant asserts that the court abused its discretion by refusing his second motion to sequester the jury during trial.

The practice of keeping the members of a jury together during trial and through its deliberations is of ancient origin. Pursuant to the common-law of England, in both civil and criminal cases, the jurors were kept together at the bar of the Court during trial, which normally lasted no more than one day. Upon submission of the case, the jurors were placed in the custody of a sworn officer and kept together without meat, drink, fire, or candle, until they had returned a verdict. As a result of this practice, jurors were commonly referred to as prisoners of the court. Indeed, it appears that if the jurors did not reach a verdict before the rising of the court, they were not discharged, "but were carried around the circuit, from town to town, in a cart." 53 Am.Jur., *Trial*, § 862 (1945).

---

**4.** Our standard is similar to that adopted by the United States Supreme Court, which has held that the existence of adverse publicity and juror exposure thereto does not presumptively deprive a criminal defendant of due process; rather, all of the circumstances must be weighed to determine if the trial accorded the defendant fundamental fairness. *See Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

**5.** *See* footnote 2, *supra*, for the text of this article.

*See also Annot.*, 34 A.L.R. 1115 (1925); *State v. Muncey*, 102 W.Va. 462, 135 S.E. 594 (1926); *State v. Cotts*, 49 W.Va. 615, 39 S.E. 605 (1901). The ancient rule requiring sequestration of the jury served two purposes. The first was to prevent the possible contamination of verdicts by extraneous and improper influences. The second purpose, which accounted for the hardships and inconveniences to which the jury was subjected, was to encourage the jurors to agree.

The English rule of law requiring sequestration survived in colonial Virginia. It was in due course codified by the Virginia General Assembly, and restricted to criminal trials of defendants charged with felonies, *see* 1849 Code of Virginia ch. 208, § 11, although vestiges of the practice remained in the civil law. *See* 1849 Code of Virginia ch. 163, § 12. Thus, at the time of the drafting of the West Virginia Constitution, the rule of law prevailing in Virginia required that jurors be kept together during the entire trial of a person charged with the commission of any felony. Sequestration of the jury was considered an incident of trial, based upon the principle that

> the accused, in every felony case, was not only entitled to a jury free from exception when impanelled to try his case, but that he had a right to have them remain so until the verdict was rendered by keeping them free, as far as possible, from all extraneous influences.

*Robinson v. Commonwealth*, 182 Va. 42, 43–44, 28 S.E.2d 10, 11 (1943) (discussing pre-1878 Virginia practice); *see generally* 11B Michie's Jurisprudence, *Jury* § 55 (1978).

The Virginia rule requiring sequestration of the jury in felony cases naturally became the law of West Virginia. *See* W.Va. Const. art. VIII, § 13. Further, the West Virginia Legislature, following the lead of Virginia, codified the rule in the first Code of West Virginia:

> After a jury in a case of felony is empaneled and sworn, they shall be kept together and furnished with suitable board and lodgings by the sheriff or other officer until they agree upon a verdict or are discharged by the court. The expense thereof shall be paid by the sheriff and deducted from the per diem allowance of the jurors.

1868 Code of West Virginia ch. 159, § 6.

Sequestration was considered by early West Virginia courts to be an essential element of a criminal defendant's right to receive a fair trial. In *State v. Robinson*, 20 W.Va. 713, 760–761 (1882), Justice Johnson states:

> The reason why a jury is required to be kept together, deprived of social intercourse, not even allowed to visit their families without the attendance of an officer, is, because it is regarded to be absolutely necessary to the due administration of justice, that in a criminal trial where a man's life or his liberty is committed to the keeping of a jury of his peers, it is his right, that they should be kept absolutely free from all outside influence, which might prejudice his case with the jury and do him injury.

*See also State v. Cotts*, 49 W.Va. 615, 39 S.E. 605 (1901). Indeed, sequestration of the jury was considered so important that where an improper separation of the jury members occurred, it was presumed to be prejudicial to the defendant, and the burden of proof was placed upon the prosecution to show beyond a reasonable doubt that no injury to the defendant was suffered by reason of the separation. If the prosecution failed to make such a showing the jury verdict was required to be set aside. *See State v. Hannah*, 122 W.Va. 719, 12 S.E.2d 505 (1940); *State v. Muncey*, 102 W.Va. 462, 135 S.E. 594 (1926); *State v. Barker*, 92 W.Va. 583, 115 S.E. 421 (1922); *State v. Clark*, 51 W.Va. 457, 41 S.E. 204 (1902); *State v. Cotts*, *supra;* *State v. Harrison*, 36 W.Va. 729, 15 S.E. 982 (1892); *State v. Robinson*, *supra;* *State v. Cartright*, 20 W.Va. 32 (1882).

Sequestration of the jury in felony cases remained the rule in West Virginia until 1955. In that year the Legislature amended the applicable statute to require sequestration only in the case of felonies punishable by death. In the case of all other

felonies, sequestration was left within the discretion of the trial court. *See* 1955 W.Va. Acts, ch. 98, § 6. Following the abolition of capital punishment in West Virginia by the Legislature, the statute was again amended to place sequestration within the discretion of the trial court in all felony cases. *See* 1965 W.Va. Acts, ch. 40, § 6. This remains the statutory rule today. *See* W.Va.Code § 62-3-6 (1977 Replacement Vol.).[6]

■ It is a fundamental tenet of due process, guaranteed by the sixth and fourteenth amendments to the United States Constitution and by article III, sections 10 and 14 of the West Virginia Constitution, that a criminal defendant is entitled to trial by an impartial and objective jury free from outside influence. In recent years, a well developed body of law has emerged regarding pre-trial procedures designed to vindicate this right by insuring the initial selection of an impartial jury panel. *See, e.g., State v. Pratt,* 161 W.Va. 530, 244 S.E.2d 227 (1978) (change of venue); *State v. Pendry,* 159 W.Va. 738, 227 S.E.2d 210 (1976) (voir dire). We have neglected, however, the equally important and fundamental consideration of preventing contamination of the jury's verdict by improper outside influences during trial.

Our law since 1955 has provided no guidance to trial courts in determining when, as a matter of due process, sequestration of the jury is required to insure a criminal defendant's right to a fair trial. It has been noted that the question of jury sequestration has assumed increasing importance in recent years, accentuated by the protracted length of many criminal trials, the pervasiveness of the media in modern society, and the cost of housing and living facilities for a sequestered jury. *See Annot.,* 72 A.L.R.3d 131 (1976). Sequestration of the jury during the trial of all felony cases was a matter of right at the time of the adoption of the West Virginia Constitution, when the electronic media were nonexistent and regularly published newspapers were not a pervasive influence in the community.[7] In this day and age, when the electronic and print media have pervaded the fabric of modern civilization, jury sequestration as a means of insuring the right to a fair trial becomes of compelling importance. Indeed, sequestration has

---

**6.** After a jury in a case of felony is impaneled and sworn, the court, in its discretion, may order the jury to be placed in the custody of the sheriff or other officer or officers designated by the court until the jury agree upon a verdict or are discharged by the court. While a jury is in the custody of the sheriff or other officer or officers as herein provided, they shall be furnished with suitable board and lodgings by the sheriff or other officer. After a jury has been impaneled no sheriff or other officer shall converse with, or permit anyone else to converse with, a juror unless by leave of the court. When the court orders a jury to be placed in the custody of the sheriff or other officer or officers, the court shall, in its discretion, determine the manner in which such jury shall be kept in custody by the sheriff or other officer or officers until the jury agree upon a verdict or are discharged by the court.

**7.** In 1860 a scant forty-three newspapers existed in the counties comprising West Virginia. Of these papers, three were dailies, thirty-six were weeklys, two were tri-weeklys, and two were monthlys. The name of each paper and county in which it was published is: Barbour—*Barbour Jeffersonian* (Weekly); Berkeley—*Republican* (Weekly); *Gazette* (Weekly); Brooke—*Wellsburg* *Weekly Herald* (Weekly); *Millennium Harbinger* (Monthly); *Stylus* (Monthly); Greenbrier—*Era* (Weekly); *Chronicle* (Weekly); *Independent* (Weekly); Hampshire—*Virginia Argus* (Weekly); *South Branch Intelligencer* (Weekly); *Piedmont Independent* (Weekly); Hardy—*Hardy Whig* (Weekly); Harrison—*Cooper's Clarksburg Register* (Weekly); Jackson—*Virginia Chronicle* (Weekly); Jefferson—*Free Press* (Weekly); *Spirit of Jefferson* (Weekly); *Independent Democrat* (Weekly); *Shepherdstown Register* (Weekly); Kanawha—*Kanawha Republican* (Weekly); *Kanawha Valley Star* (Weekly); Lewis—*Weston Herald* (Weekly); Marion—*Methodist Protestant Sentinel* (Weekly); *Fairmont Free Virginian* (Weekly); Mason—*Republican* (Weekly); Monongalia—*Virginia Weekly Star* (Weekly); Morgan—*Constitution* (Weekly); Ohio—*Union* (Daily); *Union* (Tri-Weekly); *Union* (Weekly); *Intelligencer* (Daily); *Intelligencer* (Tri-Weekly); *Intelligencer* (Daily); *Virginia Staats Zeitung* (Weekly); Ritchie—*Democrat* (Weekly); Taylor—*The Family Visitor* (Weekly); *Grafton Guardian* (Weekly); *Virginia Plain Dealer* (Weekly); Wayne—*Ceredo Crescent* (Weekly); and, Wood—*Parkersburg News* (Weekly); *Parkersburg Gazette* (Weekly); *Southern Methodist Itinerate* (Weekly); *Western Virginia Baptist* (Weekly). *See* J. Callahan, *History of West Virginia Old and New* at 313 (1923).

been characterized as the most effective means available to prevent the jury from being infected with prejudicial publicity after it is impaneled. *See* Note, *Sequestration: A Possible Solution to the Free Press—Fair Trial Dilemma,* 23 Am.U.L. Rev. 923 (1974); Note, *The Case Against Trial By Newspaper: Analysis and Proposal,* 57 Nw.U.L.Rev. 217 (1962). *See also* Note, *Alternatives Available To Trial Courts To Protect Jurors From Pretrial Publicity,* 9 Seton Hall L.Rev. 73 (1977).

While W.Va.Code § 62–3–6 places the matter of jury sequestration within the discretion of the trial court, such discretion is necessarily limited by the requirements of due process. Jury sequestration in felony cases was considered fundamental to due process when the West Virginia Constitution was adopted. *See State v. Robinson, supra.* The same constitution admonishes us that "[f]ree government and the blessings of liberty can be preserved to any people only ... by a frequent recurrence to fundamental principles." W.Va. Const. art. III, § 20. Although the Legislature has the implicit authority to alter the common-law, *see* W.Va. Const. art. VIII, § 13, the ability of the Legislature to act with respect to procedures considered fundamental to due process is conditioned upon their acting in aid thereof. Accordingly, W.Va. Code § 62–3–6 reminds us that jury sequestration is a viable procedure to insure due process.

■ Certainly, sequestration of the jury should not be necessary in every felony case.[8] Rather, the necessity of sequestration will depend upon the facts of the particular case. In determining whether sequestration of the jury during trial of a felony is required as a matter of due process to prevent contamination of the verdict, numerous factors must be considered. These include: the nature of the crime with which the defendant is charged; the exist-

ence and pervasiveness of pre-trial publicity provided by print and electronic media; whether any such publicity is prejudicial to the defendant; the existence of daily newspapers, or television or radio stations which can be expected to provide continuing media coverage of the trial; expressed public sentiment for or against the accused; the expected length of trial; the physical facilities of the courthouse where trial will take place and whether they provide an exclusive means of ingress and egress for members of the jury; and any other factors which may be considered relevant in the issue of sequestration of the jury.

■ Either party may move for sequestration of the jury prior to trial or at any time during the course of trial. We recognize, however, that in appropriate circumstances, sequestration is a matter which should be raised sua sponte by the trial court. *See Sheppard v. Maxwell,* 384 U.S. 333, 350, 86 S.Ct. 1507, 1515, 16 L.Ed.2d 600 (1966). *See also Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 552, 96 S.Ct. 2791, 2799, 49 L.Ed.2d 683 (1976). When sequestration is requested by motion, counsel should provide the trial court with an adequate basis to support a finding that there is a reasonable probability that, absent sequestration, the jury will be exposed to outside influences which could improperly taint their verdict. Once this initial showing is made, the burden falls upon the party opposing the motion to demonstrate that sequestration is not necessary to vindicate the due process guaranty of a fair trial by an impartial jury free from outside influences. The trial court's findings of fact and conclusions of law on the issue of sequestration shall be made a matter of record. Whenever sequestration is ordered pursuant to motion, the court, in advising the jury of the decision, should not

---

8. Sequestration may be undesirable for several reasons, including the costs associated with secluding a jury in a complicated and lengthy case. Other considerations include the hardships placed upon the jurors, and the resulting possibility of resentment towards the defendant. *See State v. Allen,* 73 N.J. 132, 373 A.2d 377

(1977). There are also reported cases in which the defendant objected to sequestration of the jury on due process grounds. *See, e.g., Baker v. United States,* 401 F.2d 958 (D.C.Cir.1968); *Commonwealth v. Cohen,* 203 Pa.Super. 34, 199 A.2d 139 (Super.Ct.1964); *United States v. Holovachka,* 314 F.2d 345 (7th Cir.1963).

disclose which party requested sequestration.[9]

■ In this case a majority of the Court cannot conclude that the trial court abused its discretion in refusing to sequester the jury during trial. The showing made by the appellant in support of sequestration consisted primarily of the newspaper article published on December 8, 1981.[10] A majority of the Court does not believe this single newspaper report was sufficient to require sequestration below. Accordingly, we find no error on this point.

## IV.

In his fourth and fifth assignments of error the appellant contends that the trial court erred in admitting State's Exhibit No. 2, a photograph of the deceased victim, into evidence and permitting it to be shown to the jury. The photograph in question is one of a series of black and white photographs taken by a professional photographer at the scene of the crime. It depicts the victim as she was found in bed lying on her back, partially nude, with her hands tied, and with several stab wounds to the upper torso. The State maintained at trial that admission of the photograph was necessary to "demonstrate in more detail than was gone into with anyone on the witness stand, the means and manner of the death of Lucille Berry." The State further argued below that the photograph "establishes through the witness the corpus delicti in the matter and the identification of the deceased ... [and that it] would allow the jurors to make a comparison for themselves between State's Exhibit 7–A, the knife, and several wounds upon the body of the deceased." Defense counsel objected to the exhibit's admission, arguing that the photograph was gruesome, and that its evidentiary value was outweighed by its inflammatory effect.

■ In *State v. Rowe*, 163 W.Va. 593, 259 S.E.2d 26 (1979), we adopted guidelines to assist trial courts in determining the admissibility of photographs of victims in criminal cases where the objection is made that the photographs are gruesome and therefore unduly prejudicial. Essentially, the standard adopted in *Rowe* comprises a two-step inquiry. The first step involves the determination of whether the photographs are in fact "gruesome." Several factors are to be considered. As we stated in *Rowe:* "Photographs that show much gore and blood, or emphasize contorted facial or bodily features, or depict a body after autopsy procedures; and color photographs and enlargements of particular areas of a corpse magnifying its revolting aspects will be more likely condemned as gruesome." 163 W.Va. at 595, 259 S.E.2d at 28. If the court makes the preliminary finding that the photographs are gruesome, they are presumed to have a prejudicial and inflammatory effect. Accordingly, before the photographs may be admitted, the State must meet the second-step of the *Rowe* inquiry and show that the photographs "are of essential evidentiary value to its case." 163 W.Va. at 596, 259 S.E.2d at 28.

The appellant maintains that the court below determined that the photograph was not gruesome. Examination of the record, however, reveals that no clear finding was made on this point. Accordingly, we are unable to say with certainty whether the trial court did not believe the photograph was gruesome, or, whether the court found the photograph to be gruesome, but believed that its probative value outweighed any inflammatory effect. This Court held in syllabus point six of *State v. Buck*, 170 W.Va. 428, 294 S.E.2d 281 (1982): "In order for photographs to come within our gruesome photograph rule established in *State v. Rowe*, 163 W.Va. 593, 259 S.E.2d 26 (1979), there must be an initial finding that they are gruesome." *See also State v. Church*, 168 W.Va. 408, 284 S.E.2d 897 (1981); *State v. Haddox*, 166 W.Va. 630, 276 S.E.2d 788 (1981).

■ We do not believe the photograph in issue in this case was sufficiently gruesome as to preclude its admission into evidence. The photograph does not depict the

---

**9.** *Cf.* A.B.A. Standard 8–3.6(b), *Standards Relating to Fair Trial and Free Press,* II STANDARDS FOR CRIMINAL JUSTICE at 8.49 (2d ed. 1980).

**10.** *See* footnote 2, *supra.*

body of the victim after autopsy procedures; nor does it emphasize contorted facial or bodily feature, or otherwise emphasize or magnify any revolting aspects of the corpse. While it is true that the photograph shows much blood, its impact is lessened in a black and white photograph. Consequently, we reject the appellant's fourth and fifth assignments of error.

## V.

The appellant further contends that it was error for the trial court to admit into evidence nine exhibits offered by the State, consisting of a yellow shoe lace and white electrical cord found at the scene of the crime, a knife and scabbard and two shirts recovered from Sunday Creek near Chauncy, Ohio, and a pair of jeans, a shirt, and undershorts which the defendant was wearing when taken into custody. The appellant argues that the State failed to establish a proper chain of custody for these exhibits and further failed to connect the exhibits to him either through ownership or actual possession. We find merit in neither of these arguments.

Our criteria for the admission into evidence of physical objects connected with a crime are stated in syllabus points one and two of *State v. Davis*, 164 W.Va. 783, 266 S.E.2d 909 (1980), which provide:

1. Before a physical object connected with a crime may properly be admitted into evidence, it must be shown that the object is in substantially the same condition as when the crime was committed. Factors to be considered in making this determination are: (1) the nature of the article, (2) the circumstances surrounding its preservation and custody, and (3) the likelihood of intermeddlers tampering with it.

2. The preliminary issue of whether a sufficient chain of custody has been shown to permit the admission of physical evidence is for the trial court to resolve. Absent abuse of discretion, that decision will not be disturbed on appeal.

*See also State v. Maynard*, 170 W.Va. 40, 289 S.E.2d 714 (1982); *State v. Rector*, 167 W.Va. 748, 280 S.E.2d 597 (1981).

In this case, the State went to great lengths to trace the chain of custody of each of the exhibits from the time they were taken into custody, through their use at the appellant's first trial, and their subsequent admission at the appellant's retrial. As this interval of time encompassed a period of over four years, it is understandable that not every moment of time was accounted for. However, as this Court stated in *State v. Davis, supra:*

To allow introduction of physical evidence into a criminal trial, it is not necessary that every moment from the time evidence comes into the possession of a law enforcement agency until it is introduced at trial be accounted for by every person who could conceivably come in contact with the evidence during that period, nor is it necessary that every possibility of tampering be eliminated, it is only necessary that the trial judge, in his discretion, be satisfied that the evidence presented is genuine and, in reasonable probability, has not been tampered with.

164 W.Va. at 786–787, 266 S.E.2d at 911–912 (footnotes and citation omitted).

As was the case in *Davis*, there appears to be no legitimate doubt on the record that the exhibits in question were genuine and free from tampering or material alteration. All of the exhibits were sufficiently connected to the crime or to the defendant. The shoelace and the electrical cord were found at the scene of the murder and were identified by testimony at trial. The knife and scabbard and the articles of clothing recovered from Sunday Creek were found shortly after the murder when Brainard told the authorities that the appellant had thrown them there. Finally, it cannot be disputed that the clothing taken from the appellant at the time of his arrest is sufficiently connected to the appellant. Moreover, each of the exhibits was shown by testimony to be in substantially the same condition as when taken into custody by authorities. Accordingly, we do not disturb the trial court's decision permitting the admission of these exhibits.

## VI.

■ In the early morning hours after the murder of Mrs. Berry, the appellant and Brainard travelled to the home of the appellant's sister, Katherine Reed, in Corning, Ohio. After eating breakfast there, the three went to the home of Mrs. Reed's daughter and son-in-law, Debbie and Mike Tivner, who also lived in Corning. While at the Tivner's home, the appellant wrote a statement in which he admitted killing Mrs. Berry. He then directed Mr. Tivner to make two hand-written copies of the statement. The appellant then signed the two copies, which were each witnessed by Mr. Tivner. Both copies of the statement were introduced into evidence at trial. Apparently, the original was not recovered by the authorities.

The defendant objects to the admission of the statements contending that there was no showing that the statements were voluntarily made by the appellant, and that considerable doubt surrounded their authenticity. The appellant's contentions are premised upon his claims that he was intoxicated at the time the statements were made, and that he cannot recall signing them.

■ The appellant's claims are without merit. The statements in question were made by the appellant prior to his being taken into custody by the authorities. Consequently, an *in camera* hearing to determine their voluntariness was not required below. As this Court held in syllabus point three of *State ex rel. White v. Mohn,* 168 W.Va. 211, 283 S.E.2d 914 (1981) (quoting syllabus point 1, *State v. Johnson,* 159 W.Va. 682, 226 S.E.2d 442 (1976)):

A spontaneous statement by a defendant made prior to any action by a police officer or before an accusation, arrest or any custodial interrogation is made or

undertaken by the police may be admitted into evidence without the voluntariness thereof first having been determined in an *in camera* hearing.

Although the appellant's claim that he was intoxicated at the time the statements were made may have some bearing upon the reliability of the statements, such claim does not preclude their admission into evidence. Rather, this was properly a matter of the weight which the jury should attribute to the statements. We note in this regard that Mr. Tivner testified that at the time the statements were made the appellant appeared normal and did not act as if he were drunk. Moreover, the authenticity of the statements was clearly established by the testimony of Brainard and Mr. Tivner who were both present at the time statements were made and who both testified that the appellant signed the statements. The appellant's claim that he cannot recall signing the statements does not contradict their testimony.

## VII.

■ Finally, the appellant contends that the trial court erred in permitting the State to proceed under a felony murder theory in the presentation of its case when there was no mention of the underlying felony of robbery in the indictment. The appellant specifically objects to the giving of State's Instruction No. 4, which instructed the jury on the elements of robbery, and State's Instruction No. 9, which instructed the jury that it could find the appellant guilty of murder in the first degree while engaged in the commission of a robbery.[11]

■ The felony murder doctrine, as developed at common law, provides that where a homicide occurs in the course of, or as a result of, a separate, distinct felony,

11. State's Instruction No. 4 provides:
    The Court instructs the jury that robbery is committed when one person takes or attempts to take from the person or from the presence of another person any property or money or any other thing of value belonging to or in the care, custody, control, management, or possession of such other person by force or violence or by putting such person in fear.

State's Instruction No. 9 provides, in pertinent part:
    The Court further instructs the jury that murder in the first degree is when one person kills another person unlawfully, wilfully, maliciously, deliberately and premeditatedly, or when one person kills another person while in the commission of, or attempt to commit a robbery ....

the felonious intent involved in the underlying felony may be transferred to supply the intent to kill necessary to characterize the homicide as murder. *See generally* 40 Am.Jur.2d, *Homicide,* § 72 *et seq.* (1968); *Annot.,* 13 A.L.R. 4th 1226 (1982). The doctrine has been much criticized in modern times,[12] and has been abolished or substantially emasculated in a number of jurisdictions.[13] It survives in West Virginia by virtue of W.Va.Code § 61-2-1 (1977 Replacement Vol.), which provides:

> Murder by poison, lying in wait, imprisonment, starving, or by any wilful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, rape, robbery or burglary, is murder of the first degree. All other murder is murder of the second degree. ·
>
> In an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, wilfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased.

This statute alters the scope of the common law felony murder doctrine by confining its application to the underlying felonies of arson, rape, robbery or burglary, or the attempt to commit these crimes. *State v.*

*Sims,* 162 W.Va. 212, 248 S.E.2d 834 (1978). The felony murder rule codified at W.Va. Code § 61-2-1 has been held to be constitutional by this Court. *See State v. Taylor,* 168 W.Va. 380, 285 S.E.2d 635 (1981); *State ex rel. Peacher v. Sencindiver,* 160 W.Va. 314, 233 S.E.2d 425 (1977). *See also State v. Wayne,* 169 W.Va. 785, 289 S.E.2d 480 (1982); *State v. Sims, supra.*

The thrust of the appellant's argument is that his indictment for murder, which followed the form of W.Va.Code § 61-2-1,[14] failed to inform him of the State's intention to prosecute him under a felony murder theory, and therefore the presentation of evidence relating to robbery "unfairly placed the [appellant at] an unwarranted disadvantage during his retrial."[15] Because he had no notice of the State's intention to present evidence of robbery, the appellant contends that the trial court should have refused the State's instructions outlining the elements of the offense of robbery and the felony murder rule.

■ At the outset it must be recognized that the murder indictment in the case at bar, is, as a matter of law, sufficient to support a conviction for felony murder. As this Court held in syllabus point five of *State v. Bragg,* 160 W.Va. 455, 235 S.E.2d 466 (1977):

> An indictment which charges that the defendant feloniously, wilfully, mali-

---

12. *See, e.g.,* Note, *Limitations on the applicability of the felony-murder rule in California,* 22 Hastings L.J. 1327 (1971); Note, *The felony murder doctrine repudiated,* 36 Ky.L.J. 106 (1947); Comment, *The felony murder rule in Ohio,* 17 Ohio St.L.J. 130 (1956); Morris, *The felon's responsibility for the lethal acts of others,* 105 U. of Pa.L.Rev. 50 (1956); Ludwig, *Foreseeable death in felony murder,* 18 U. of Pitt.L.Rev. 51 (1956); Note, *A survey of felony murder,* 28 Temple L.Q. 453 (1955); Crum, *Causal relations and the felony murder rule,* 1952 Wash.U.L.Q. 190; Note, *Felony murder as a first degree offense: An anachronism retained,* 66 Yale L.J. 427 (1957).

13. *See, e.g., People v. Phillips,* 64 Cal.2d 574, 51 Cal.Rptr. 225, 414 P.2d 353 (1966); *State v. Galloway,* 275 N.W.2d 736 (Iowa 1979); *People v. Aaron,* 409 Mich. 672, 299 N.W.2d 304 (1980); *State v. Millette,* 112 N.H. 458, 299 A.2d 150 (1972); *State v. Harrison,* 90 N.M. 439, 564 P.2d 1321 (1977); *State v. Lockett,* 49 Ohio St.2d 48, 358 N.E.2d 1062 (1976) *overruled on other*

grounds, *State v. Downs,* 51 Ohio St.2d 47, 364 N.E.2d 1140 (1977) *(vacated, in part, on other grounds,* 438 U.S. 909, 98 S.Ct. 3133, 57 L.Ed.2d 1153 (1978)); *and reversed, in part, on other grounds,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Commonwealth ex rel. Smith v. Myers,* 438 Pa. 218, 261 A.2d 550 (1970).

14. The indictment provided, in pertinent part: "That John Lewis Young on the 1st day of December, 1976, in the said County of Mason, did unlawfully, feloniously, wilfully, maliciously and deliberately slay, kill and murder one Mary Lucille Berry."

15. In this regard, the appellant asserts that he was originally charged and indicted for burglary, as well as for murder, and that the burglary indictment was allowed to lapse by the Mason County Prosecuting Attorney. There is some indication in the record, however, that the appellant was tried on the burglary charge in the Circuit Court of Cabell County.

ciously, deliberately, premeditatedly and unlawfully did slay, kill and murder is sufficient to support a conviction for murder committed in the commission of, or attempt to commit arson, rape, robbery or burglary, it not being necessary, under *W.Va.Code*, 61–2–1, to set forth the manner or means by which the death of the deceased was caused.

Further, it cannot be seriously contended that the appellant had no notice of the State's intention to present evidence of robbery at trial. Indeed, it appears from the record that the first mention of the offense of robbery and of the State's felony murder theory came from the mouth of defense counsel during his opening remarks to the jury. Moreover, information divulged by the State during pre-trial discovery conveyed to defense counsel its intention to present evidence of robbery at trial. Accordingly, we find that the appellant's claim of unfair surprise is without merit.

■ The remaining issue to be resolved concerns the propriety of the giving of State's Instruction Nos. 4 and 9. Since these instructions contain proper statements of law, and were supported by the evidence, we find no error below on this point. "An instruction to the jury is proper if it is a correct statement of the law and if sufficient evidence has been offered at trial to support it." Syllabus Point 8, *State v. Hall*, 171 W.Va. 212, 298 S.E.2d 246 (1982).

For the foregoing reasons, this case is remanded to the Circuit Court of Mason County for resentencing of the appellant.

Remanded.

McHUGH, Justice, concurring:

I agree with the result reached by the majority in this case in that it should be remanded to the Circuit Court of Mason County for resentencing. I do, however, have concerns relating to the language used by the majority to resolve two of the issues.

My first concern relates to the confusion that I perceive to be created by the majority opinion by what appears to be the synonymous use of double jeopardy concepts with due process concepts.

In the case now before us, I agree that upon a retrial, the defendant may not be convicted of an offense greater than that for which he was convicted in his first trial because of double jeopardy considerations. *Green v. United States*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).

The majority, however, bases its result in the case now before us upon the case of *State v. Eden*, 163 W.Va. 370, 256 S.E.2d 868 (1979). That case held, incorrectly I believe, that the due process provision of the West Virginia Constitution (Art. III, § 10) precluded a circuit judge, upon a trial *de novo*, from imposing a harsher sentence upon a defendant than that imposed by a justice of the peace (now magistrate). The rationale of the case of *Colten v. Kentucky*, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972) was rejected. *Colten v. Kentucky* held that there was no due process problem in a court system similar to that in West Virginia when a greater sentence was imposed, after a trial *de novo*, in a superior court than that which was imposed by the inferior court. I would follow the principles set forth in *Colten v. Kentucky*, which also refused a double jeopardy argument.

If presented with the opportunity, I would also alter the principles enumerated in Syl. pt. 3, *State v. Cobb*, 166 W.Va. 65, 272 S.E.2d 467 (1980), to clarify that under certain circumstances a harsher penalty may be imposed upon a defendant after conviction at a second trial than was received at the original trial. Accordingly, language contained in *State v. Gwinn*, 169 W.Va. 456, 288 S.E.2d 533 (1982), relating to *Eden* and *Cobb* should be modified.

I would follow the logic and law of *Chaffin v. Stynchcombe*, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973).

My second concern relates to the handling in the majority opinion of the issue of sequestration of the jury. I would have disposed of this issue by holding that the trial judge did not abuse his discretion in refusing to sequester the jury. Instead, the majority has chosen, I believe unneces-

sarily, to interject a due process constitutional law concept involving the sequestration of a jury. The majority has traced the common law and statutory history of sequestration of a jury. It seizes upon the "due administration of justice" language in *State v. Robinson*, 20 W.Va. 713, 760–61 (1882), and propels itself into what I believe will result in confusion in the administration of justice in trial courts. Several observations are in order. Quite correctly, the majority states that, "It has been noted that the question of jury sequestration has assumed increasing importance in recent years accentuated by the protracted length of many criminal trials, the pervasiveness of the media in modern society, and the cost of housing and living facilities for a sequestered jury." Omitted, however, from the majority opinion is additional language which appears in footnote 5 of Annot., 72 A.L.R.3d 131 (1976).

> [T]he trend of modern decisions seems to constantly taper off from the ancient idea that the confinement of the jury in a criminal case is a prerequisite to insure an uninfluenced verdict. Judicial discretion and proper supervisory powers appear to be meeting with constantly added support, and the basis of determination seems to be whether or not the record indicates any actual or possible prejudice by reason of the departures indulged in.

In *State v. Magwood*, 290 Md. 615, 624, 432 A.2d 446, 450–51 (1981), the Court of Appeals of Maryland rejected an argument that sequestration of a jury had constitutional status under the Article 5 guaranty of trial by jury contained in the Maryland Declaration of Rights. The Maryland court noted:

> [W]e point out that the ancient common law doctrine prohibiting jury separation is not generally thought to be such an integral part of the right to a jury trial that sequestration has constitutional status. Consequently, the federal courts, perceiving no constitutional issue, have relegated jury separation, whether before or during deliberations, to the discretion of the trial judge, and, absent 'an affirmative showing of prejudice and abuse of discretion,' the decision will not

be questioned. [Cases cited in support thereof omitted].

The majority also states "that in appropriate circumstances, sequestration is a matter which should be raised *sua sponte* by the trial court. *See Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)." The *Sheppard* opinion details the bizarre coverage given by the media to the Sam Sheppard case. By any rational judgment, Sheppard was denied due process of law because of prejudicial news coverage which affected his right to an impartial jury free from outside influences. The Court chastised the trial judge for his failure to control the trial. One of the suggested means to avoid the result of the Sheppard case is the raising by the trial judge, *sua sponte*, with counsel the issue of jury sequestration. Clearly, the trial judge has the duty to insure an orderly and fair judicial proceeding. But, we should be vigilant to keep the "appropriate circumstances" in perspective, lest every denial of jury sequestration be raised to a constitutional due process level.

If the majority pursues with vigor what I fear may be implied in this decision on this issue, West Virginia will be far afield from the main line of judicial thought.